PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-3531
_____

PEDRO LOZANO; HUMBERTO HERNANDEZ; ROSA
LECHUGA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, a
Minor, by His parents; JANE DOE 1; JANE DOE 2; JANE DOE
3; JOHN DOE 4, a Minor by His parents, BRENDA LEE
MIELES; CASA DOMINICANA OF HAZLETON, INC.;
HAZLETON HISPANIC BUSINESS ASSOCIATION;
PENNSYLVANIA STATEWIDE LATINO COALITION; JANE
DOE 5; JOHN DOE 7; JOSE LUIS LECHUGA


v.

CITY OF HAZLETON,

Appellant

Appeal from the United States District Court
for the Middle District of Pennsylvania
(No. 3:06-cv-01586)
District Judge: Honorable James M. Munley

Argued October 30, 2008

Before: McKEE, *Chief Judge*, and NYGAARD and SILER,[*]
*Circuit Judges*

(Opinion filed September 9, 2010)

Witold J. Walczak, Esq. **(ARGUED)**
American Civil Liberties Union of Pennsylvania
313 Atwood Street
Pittsburgh, PA 15213

Omar Jadwat, Esq. **(ARGUED)**
Lee P. Gelernt, Esq.
American Civil Liberties Union
Immigrant Rights' Project
125 Broad Street
18th Floor
New York, NY 10004-2400

Jennifer Chang, Esq.
Lucas Guttentag, Esq.
American Civil Liberties Union Foundation
39 Drumm Street
San Francisco, CA 94111

Jackson Chin, Esq.
Foster Maer, Esq.

---

[*] Honorable Eugene E. Siler, Jr., Senior Judge of the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Ghita Schwarz, Esq.
Puerto Rican Legal Defense & Education Fund
99 Hudson Street
14th Floor
New York, NY 10013

Thomas B. Fiddler, Esq.
White & Williams
1650 Market Street
One Liberty Place, Suite 1800
Philadelphia, PA 19103

Elena Park, Esq.
Cozen & O'Connor
200 Four Falls Corporate Center
P.O. Box 800, Suite 400
West Conshohocken, PA 19428-0800

Ilan Rosenberg, Esq.
Thomas G. Wilkinson, Jr., Esq.
Cozen & O'Connor
1900 Market Street
3rd Floor
Philadelphia, PA 19103

Shamaine A. Daniels, Esq.
Community Justice Project
118 Locust Street
Harrisburg, PA 17101

*Counsel for Plaintiffs-Appellees*

Kris W. Kobach, Esq. **(ARGUED)**
Professor of Law
University of Missouri (Kansas City)
5100 Rockhill Road
Kansas City, MO 64110-2499

Harry G. Mahoney, Esq.
Carla P. Maresca, Esq.
Andrew B. Adair, Esq.
Deasey Mahoney, Valentini & North
1601 Market Street
Suite 3400
Philadelphia, PA 19103-2978

Elizabeth S. Gallaway, Esq.
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, CO 80227

Michael M. Hethmon, Esq.
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W.
Suite 330 B
Washington, DC 20001

*Counsel for Defendant-Appellant*

Damon Scott
1446 Fair Oaks Lane
Florence, SC 29506-5733

Paul J. Orfanedes, Esq.
James F. Peterson, Esq.
Judicial Watch, Inc.
501 School Street, S.W.
Washington, DC 20024

Richard A. Samp, Esq.
Washington Legal Foundation
2009 Massachusetts Avenue, N.W.
Washington, DC  20036

Andrew L. Schlafly, Esq.
17th Floor
521 Fifth Avenue
New York, NY 10175

*Counsel for Amicus Appellant*s

Robin S. Conrad, Esq.
National Chambers Litigation Center
1615 H Street, N.W.
Washington, DC  20062

Carter G. Phillips, Esq.
Eric A. Shumsky, Esq.
Sidley Austin
1501 K Street, N.W.
Washington, DC  20005

Burt M. Rublin, Esq.
Ballard Spahr
1735 Market Street
51st Floor
Philadelphia, PA 19103

Diana S. Andsager, Esq.
Mayer Brown
71 South Wacker Drive
Chicago, Il 60603

Nancy Winkelman, Esq.
Schnader Harrison Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103

Kenneth J. Pfaehler, Esq.
Sonnenschein, Nath & Rosenthal
1301 K Street, N.W.
Suite 600 East Tower
Washington, DC  20005

Charles D. Weisselberg, Esq.
Berkley Law School
688 Simon Hall
Berkley, CA 94720

Jacob S. Pultman, Esq.
Allen & Overy
1221 Avenue of the Americas
New York, NY 10020

John W. West, Esq.
Bredhoff & Kaiser
805 Fifteenth Street, N.W.
Suite 1000
Washington, DC 20005

Mark D. McPherson, Esq.
Morrison & Foerster
1290 Avenue of the Americas
New York, NY 10104

*Counsel for Amicus Appellee*s

OPINION

McKEE, *Chief Judge*.

TABLE OF CONTENTS

I. INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II. FACTUAL AND PROCEDURAL BACKGROUND. . . . . . . 10
    A. Hazleton and its Ordinances. . . . . . . . . . . . . . . . . . . . 10
        1. The Illegal Immigration Relief Act Ordinance. 14
        2. The Rental Registration Ordinance.. . . . . . . . . 21
    B. The Plaintiffs. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    C. Procedural History. . . . . . . . . . . . . . . . . . . . . . . . . . 24

III. JURISDICTION AND STANDARD OF REVIEW. . . . . . . 26

IV. SEVERABILITY AND STANDING. . . . . . . . . . . . . . . . . . 26
    A. General Principles of Standing.. . . . . . . . . . . . . . . . . 30
    B. Constitutional Standing. . . . . . . . . . . . . . . . . . . . . . . 33
        1. The Employment Provisions. . . . . . . . . . . . . . 33
        2. Private Cause of Action. . . . . . . . . . . . . . . . . . 41
        3. Housing Provisions. . . . . . . . . . . . . . . . . . . . . 43
            a. Landlord Plaintiffs.. . . . . . . . . . . . . . . 44
            b. Tenant Plaintiffs. . . . . . . . . . . . . . . . . 52
    C. Prudential Standing. . . . . . . . . . . . . . . . . . . . . . . . . . 56

V.  ANONYMITY AND CONFIDENTIALITY. . . . . . . . . . . . . 62

VI.  DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
      A.  Federal Immigration Law. . . . . . . . . . . . . . . . . . . . . 67
           1.  The Immigration and Nationality Act. . . . . . . 67
           2.  The Immigration Reform and Control Act. . . . 73
           3.  The Illegal Immigration Reform and Immigrant Responsibility Act. . . . . . . . . . . . . . . . . . . 78
      B.  State and Local Immigration Laws. . . . . . . . . . . . . . 81
      C.  Pre-emption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84
           1.  Employment Provisions. . . . . . . . . . . . . . . . . . 94
               a.  Presumption Against Pre-emption. . . . 94
               b.  Express Pre-emption. . . . . . . . . . . . . . 97
               c.  Conflict Pre-emption. . . . . . . . . . . . . 105
           2.  Housing Provisions. . . . . . . . . . . . . . . . . . . . . 132

VII.  CONCLUSION .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 146

VIII.  APPENDIX. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147
      A.  The Illegal Immigration Relief Act Ordinance. . . . 147
      B.  Rental Registration Ordinance. . . . . . . . . . . . . . . . . 167

## I.  INTRODUCTION

"Since the late 19th century, the United States has restricted immigration into this country. . . . But despite the existence of these legal restrictions, a substantial number of persons have succeeded in unlawfully entering the United

8

States, and now live within [the] various States." *Plyler v. Doe*, 457 U.S. 202, 205 (1982). The dispute we are now called upon to address is one of an increasing number of cases that have arisen from actions that state and local governments have taken because of illegal immigration.

The City of Hazleton, Pennsylvania ("Hazleton" or the "City") is appealing a permanent injunction that the district court entered prohibiting Hazleton's enforcement of two local ordinances that attempt to regulate employment of, and provision of rental housing to, certain aliens. Several individuals and organizations sued to enjoin enforcement of the ordinances arguing that they violate the United States Constitution, as well as federal and state statutes. The district court agreed and enjoined Hazleton from enforcing the ordinances in their entirety.

We now hold that the district court erred in reaching the

9

merits of the challenge to the private cause of action provision because no plaintiff has standing to challenge that provision. Accordingly, that portion of the district court's order will be vacated. However, although our reasoning differs somewhat from the analysis used by the district court, we conclude that it correctly enjoined the rest of the challenged ordinances. We will therefore affirm the district court's order in all other respects.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Hazleton and its Ordinances

The City of Hazleton is located in Luzerne County in northeastern Pennsylvania. *Lozano v. City of Hazleton*, 496 F. Supp. 2d 477, 484 (M.D. Pa. 2007). Under Pennsylvania law, Hazleton is classified as a City of the Third Class and operates under an "Optional Plan B" form of government. *Id.* Its executive is a mayor, and its legislature is a city council. *Id.*

10

Hazleton's population was only 23,000 in 2000. *Id.* Between 2000 and the time of trial, however, its population increased to between 30,000 and 33,000. *Id.* Much of this growth was due to an influx of Latino families who migrated from New York and New Jersey to Pennsylvania in the early 2000s. *Id.* These newcomers included United States citizens and lawful permanent residents, as well as persons lacking lawful immigration status, who are often referred to as "undocumented immigrants" or "illegal aliens."[1] *Id.*

---

[1] Hazleton refers to persons who are not lawfully present within the United States as "illegal aliens." Plaintiffs refer to them as "undocumented immigrants." We recognize that there are significant criticisms of each term. *See, e.g.*, Beth Lyon, *When More "Security" Equals Less Workplace Safety: Reconsidering U.S. Laws that Disadvantage Unauthorized Workers*, 6 U. Pa. J. Lab. & Empl. L. 571, 576 (2004) ("Scholarly and popular concerns about the phrase 'illegal alien' abound, pointing out that the phrase is racially loaded, ambiguous, imprecise, and pejorative."); *Martinez v. Regents of the Univ. of Cal.*, 83 Cal. Rptr. 3d 518, 522 n.2 (Cal. Ct. App. 2008) ("[T]he term 'illegal alien' [is] less ambiguous [than the term 'undocumented immigrant.']"), *rev. granted*, 198 P.3d 1 (Cal. 2008).

(continued...)

Hazleton's mayor, as well as other local officials, subsequently concluded that aliens lacking lawful status were to blame for certain social problems in the City, *see* J.A. 1672-85, and that the federal government could not be relied upon to prevent such aliens from moving into the City, or to remove them, *see Lozano,* 496 F. Supp. 2d at 522 n.44. Accordingly, City officials decided to take independent action to regulate the local effects of unlawful immigration. *See* J.A. 1385, 1486-87.

---

[1](...continued)
Federal immigration law defines an "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). "Immigrant" is defined as "every alien except an alien who is within [certain specified] classes of nonimmigrant aliens," and generally refers only to lawful permanent residents. 8 U.S.C. § 1101(a)(15). Congress has preferred the term "alien" to describe those persons who lack lawful immigration status, *see, e.g.*, 8 U.S.C. §§ 1182, 1227, 1228. We will use the word "alien" rather than "immigrant" because "alien" is more precise, and precision is important to discussions in this area. When discussing issues of employment, we will use the official term: "unauthorized alien." 8 U.S.C. § 1324a. However, when discussing issues of immigration status, we will use either: "aliens not lawfully present" or "aliens lacking lawful immigration status," rather than "illegal aliens."

12

Beginning on July 13, 2006, Hazleton's City Council began enacting a series of ordinances designed to address these concerns. *Lozano*, 496 F. Supp. 2d at 484.

This litigation concerns two of those ordinances: the Illegal Immigration Relief Act Ordinance ("IIRAO"), which consists of Ordinance 2006-18, as amended by Ordinance 2006-40 and Ordinance 2007-6; and the Rental Registration Ordinance ("RO"), which consists of Ordinance 2006-13.[2] These ordinances attempt to regulate the employment of unauthorized aliens, and the provision of rental housing to aliens

---

[2] On July 13, 2006, Hazleton enacted Ordinance 2006-10, the first version of the IIRAO. On August 15, 2006, the City enacted Ordinance 2006-13, the RO. On September 21, 2006, Hazleton enacted Ordinance 2006-18, a revised version of the IIRAO, which replaced Ordinance 2006-10 in its entirety. On December 28, 2006, Hazleton enacted Ordinance 2006-40, which amended the IIRAO by adding an "implementation and process" section. Finally, during trial, the City enacted Ordinance 2007-6, which again amended the IIRAO to provide that complaints based, in full or in part, on national origin, ethnicity, or race, would be considered invalid. The full-text of these ordinances is attached as an Appendix.

lacking lawful immigration status, within Hazleton.

## 1. The Illegal Immigration Relief Act Ordinance

The IIRAO begins with a statement of findings and a

declaration of purpose, which asserts:

[t]hat unlawful employment, the harboring of illegal aliens in dwelling units in the City of Hazleton, and crime committed by illegal aliens harm the health, safety and welfare of authorized US workers and legal residents in the City of Hazleton. Illegal immigration leads to higher crime rates, subjects our hospitals to fiscal hardship and legal residents to substandard quality of care, contributed to other burdens on public services, increasing their cost and diminishing their availability to legal residents, and diminishes our overall quality of life.

IIRAO § 2C.[3] In response to these concerns, the IIRAO:

seeks to secure to those lawfully present in the United States and this City, whether or not they are citizens of the United States, the right to live in peace free from the threat [of] crime, to enjoy the public services provided by this city without being burdened by the cost of providing goods, support and services to aliens unlawfully present in the United States, and to be free of the debilitating effects on their economic and social well being imposed by the influx of illegal aliens to the fullest extent that these goals can be achieved consistent with the Constitution and Laws of the United States and the Commonwealth of Pennsylvania.

---

[3] It is important to note that the parties hotly contest whether aliens in Hazleton actually caused any of these purported problems and whether Hazleton officials had any valid reason to think they did. The district court did not make any factual findings about the cause of any social or fiscal problems Hazleton may be facing, and our discussion should not be interpreted as supporting either side of that debate.

IIRAO § 2F.

Section 4 of the IIRAO asserts that it is unlawful "for any business entity" to "recruit, hire for employment, or continue to employ" *or* "permit, dispatch, or instruct any person" who is an "unlawful worker" to perform work within Hazleton.[4]  IIRAO § 4A.  Under the IIRAO, an "unlawful worker" is defined as: "a person who does not have the legal right or authorization to work due to an impediment in any provision of federal, state or local law, including but not limited to a minor disqualified by nonage, or an unauthorized alien as defined by [8 U.S.C. § 1324a(h)(3)]."  IIRAO § 3E.  Section 4A requires "[e]very business entity that applies for a business permit" to "sign an

---

[4] The IIRAO defines "business entity" broadly to mean "any person or group of persons performing or engaging in any activity, enterprise, profession, or occupation for gain, benefit, advantage, or livelihood, whether for profit or not for profit." IIRAO § 3A.  The term encompasses (but is not limited to) "self-employed individuals, partnerships, corporations, contractors, and subcontractors."  IIRAO § 3A(1).  It includes "any business entity that possesses a business permit, any business entity that is exempt by law from obtaining such a business permit, and any business entity that is operating unlawfully without such a business permit." IIRAO § 3A(2).

affidavit . . . affirming that they do not knowingly utilize the services or hire any person who is an unlawful worker." IIRAO § 4A.

Section 4 also provides for public monitoring, prosecution, and sanctions. Any City resident may submit a complaint to Hazleton's Code Enforcement Office alleging that a local business entity is violating the section's prohibition on utilizing the services of an unlawful worker. IIRAO § 4B(1). Upon receipt of such complaint, the Code Enforcement Office requests identity information about the alleged unlawful worker from the employing business, and that business must provide the information within three business days, or Hazleton will suspend its business license. IIRAO § 4B(3). If the worker is alleged to be an unauthorized alien, the Code Enforcement Office submits any identity information received from the business to the federal government, pursuant to 8 U.S.C. § 1373, for verification of "the immigration status of such person(s)."[5] *Id.*

---

[5] 8 U.S.C. §1373(c) states: "The Immigration and
(continued...)

16

If the Code Enforcement Office confirms that the worker lacks authorization to work in the United States, the business must terminate that person within three business days or the City will suspend its business license.[6] IIRAO § 4B(4). Safe harbor from this sanction is provided to businesses that verify the work authorization of its workers through use of the "Basic Pilot Program" (which has since been named "E-Verify"). IIRAO § 4B(5). E-Verify is a federal program for verifying work authorization which Congress has authorized for use on a trial basis.

A business whose license is suspended under the IIRAO

---

[5](...continued)
Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

[6] This three business day period is tolled if the business entity acquires further information about the worker and requests a secondary verification from the federal government of the worker's authorization, or if the business entity tries to terminate the worker and that worker challenges the termination in Pennsylvania state court. IIRAO § 7C.

regains its license one business day after it submits an affidavit affirming that it has terminated the unlawful worker. IIRAO § 4B(6). If a business is found to have employed two or more unauthorized aliens at one time, it must also confirm its enrollment in E-Verify in order to recover its license.[7] IIRAO § 4B(6)(b). If a business entity violates the IIRAO a second time, Hazleton suspends its license for a minimum of twenty days and reports the violation, whether or not eventually corrected, to the federal government. IIRAO § 4B(7).

The IIRAO further creates a private cause of action against businesses that employ unlawful workers. Section 4E of the IIRAO makes it "an unfair business practice" for a business entity to discharge "an employee who is not an unlawful worker," if, on the date of the discharge, "the business entity was not participating in [E-Verify] and the business entity was employing an unlawful worker." IIRAO § 4E(1). An employee

---

[7] City agencies and business that contract with the City for amounts greater than $10,000 are also required to enroll in E-Verify. IIRAO § 4C-D.

18

discharged under these conditions may sue the business entity under the IIRAO for treble actual damages, as well as reasonable attorney's fees and costs.[8]  IIRAO § 4E(2).

The IIRAO also addresses the "harboring" of persons lacking lawful immigration status. Section 5 makes it "unlawful for any person or business entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law."[9] IIRAO § 5A.  "Harboring" is broadly defined.  The ordinance states: "to let, lease, or rent a dwelling unit to an illegal alien . . . shall be deemed to constitute harboring."  IIRAO § 5A(1). Additionally, Section 7 of the IIRAO makes legal immigration status a condition precedent to entering into a valid lease. IIRAO § 7B.  All leases entered into by persons lacking lawful status are deemed breached.  *Id.*

---

[8] Even an employee who is properly terminated for cause (or without cause in the case of an employee at will) has a cause of action under this provision.  The ordinance uses "lost" wages as a measure of "damages."  IIRAO § 4E(2).

[9] The IIRAO defines an "illegal alien" as "an alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, section 1101 et seq."  IIRAO § 3D.

The mechanisms for enforcing the housing provisions of the IIRAO are similar to those set forth above for enforcing the employment provisions. Thus, any City resident may file a complaint with Hazleton's Code Enforcement Office alleging that a property owner is illegally "harboring" a tenant who is an "illegal alien." IIRAO § 5B(1). Once such a complaint is received, the Code Enforcement Office may request identifying information about the named tenant from the property owner, and the property owner must provide that information within three days. IIRAO § 5A(3). The City then verifies the legality of the tenant's immigration status with the federal government, pursuant to 8 U.S.C. § 1373(c). IIRAO § 5B(3).

If the federal government confirms that the tenant lacks lawful immigration status, the IIRAO gives the property owner five business days to evict that tenant. IIRAO § 5B(4). If the owner fails to do so, the City suspends the owner's rental license and bars the owner from collecting any rent for the applicable dwelling unit.[10] IIRAO § 5B(4)-(5). These sanctions end one

[10] This five business day period is tolled if the property owner acquires further information about the tenant and requests a secondary verification from the federal government of the tenant's immigration status, or if the property owner tries to evict the tenant
(continued...)

20

business day after the owner submits an affidavit affirming that s/he has corrected the violation. IIRAO § 5B(6). Any subsequent violation subjects the owner to a fine of $250.00 per day per "adult illegal alien" harbored in a dwelling unit, as well as suspension of her/his rental license. IIRAO §§ 5A(2), 5B(8).

**2. The Rental Registration Ordinance**

The RO operates in conjunction with the anti-harboring provisions of the IIRAO. Section 7 of the RO requires that *any* prospective occupant of rental housing over the age of eighteen apply for and receive an occupancy permit. RO §§ 1m, 7b. To receive that permit, the prospective occupant must pay a ten-dollar fee and must submit certain documents, including "[p]roper identification showing proof of legal citizenship and/or residency" to Hazleton's Code Enforcement Office. RO § 7b. Hazleton landlords are required to inform all prospective occupants of this requirement, and they are prohibited from allowing anyone over the age of eighteen to rent or occupy a rental unit, unless that person has a permit. *Id.*

Section 10 of the RO provides that a landlord found

_____

[10](...continued)
and that tenant challenges the eviction in Pennsylvania state court. IIRAO § 7D.

21

guilty of renting to someone without a permit must pay an initial fine of $1000 per unauthorized occupant, and an additional fine of $100 per day per unauthorized occupant until the violation is corrected. RO § 10b. An authorized occupant of rental housing who is found guilty of permitting someone without a rental permit to live in her/his apartment must pay the same fine. *Id.*

## B. The Plaintiffs

The following six plaintiffs claim that they have standing to bring this suit: Pedro Lozano, John Doe 1, John Doe 3, John Doe 7, Jane Doe 5, and the Hazleton Hispanic Business Association ("Plaintiffs").[11] These Plaintiffs include Hazleton business entities, landlords, and tenants, as well as an organization whose members include Hazleton business entities and landlords. We briefly describe these Plaintiffs, and the basic facts underlying each Plaintiff's claim to standing.

Pedro Lozano is a lawful permanent resident who immigrated to the United States from Colombia in January 2002. *Lozano*, 496 F. Supp. 2d at 485-86. He owns a duplex in

---

[11] Eleven plaintiffs filed the operative complaint. The district court dismissed three of them for lack of standing, and that portion of the district court's decision is not being appealed. Of the eight plaintiffs the district court found to have standing, only six press their cases on appeal.

Hazleton and rents out half of it to help pay his mortgage. *Id.* at 488. He hires contractors to perform repairs on his property as needed. *Id.* at 489.

John Doe 1 was born in Mexico, and had lived in Hazleton for six years at the time of trial. *Id.* at 486. He is unsure of his immigration status, but believes that he could be removed from the United States. *Id.* He is similarly unsure of his work authorization. *Id.* John Doe 1's landlord evicted him because of the risk of being fined pursuant to the aforementioned provisions of the IIRAO and the RO. *Id.* at 497.

John Doe 3 had lived in Hazleton for four years at the time of trial. *Id.* at 486. He understands his immigration status to be "illegal," and he rents an apartment within Hazleton. *Id.* at 497.

John Doe 7 and Jane Doe 5 were born in Columbia and had lived in Hazleton for more than five years at the time of trial. *Id.* at 486. They rent a house in Hazleton, but fear eviction and being forced to leave Hazleton if the ordinances are enforced. *Id.* at 497.

The Hazleton Hispanic Business Association ("HHBA") is an organization of business owners from the Hazleton area

that exists to "promote the interest of [its] business members and to project the image of the Hispanic business community." *Id.* at 492 (internal quotation marks omitted). HHBA's president, Rudolfo Espinal, owns three rental properties in Hazleton and hires contractors to perform repairs on those properties as needed. *Id.* at 492-93.

## C. Procedural History

As noted above, numerous plaintiffs filed this action for injunctive relief based upon challenges to the validity of the IIRAO and the RO. *Lozano*, 496 F. Supp. 2d at 485. The district court granted these plaintiffs' motion for a temporary restraining order, and the parties agreed to extend that order until the case could be resolved on its merits. *Id.* These ordinances have never been enforced, and the challenges asserted are facial.

The amended complaint alleges that the ordinances violate the Supremacy Clause, the Due Process Clause, and the Equal Protection Clause of the United States Constitution; 42 U.S.C. § 1981; the federal Fair Housing Act, 42 U.S.C. §§ 3601-31; plaintiffs' privacy rights; Pennsylvania's Home Rule Charter Law, 53 Pa. Cons. Stat. §§ 2961-67; Pennsylvania's Landlord

24

and Tenant Act, 68 Pa. Cons. Stat. §§ 250.101-50.602; and the limits of Hazleton's police powers. *Id.*

At the conclusion of a nine-day bench trial, the district court issued a thorough opinion and order permanently enjoining the City from enforcing the ordinances. The court concluded that eight of the eleven plaintiffs had standing to challenge the IIRAO and the RO, and that it was appropriate for the John and Jane Doe Plaintiffs to proceed anonymously. The court held that the IIRAO and the RO violate the Supremacy and Due Process Clauses of the United States Constitution, as well as 42 U.S.C. § 1981. The court also held that Hazleton, as a City of the Third Class, lacked authority under Pennsylvania's Home Rule Charter Law to create the IIRAO's private cause of action, and that it exceeded its police powers in enacting these ordinances.[12]

This appeal followed. Hazleton argues that Plaintiffs lack standing, and that the district court abused its discretion both in permitting the John and Jane Doe Plaintiffs to proceed anonymously and in issuing a confidentiality order prohibiting

---

[12] The district court dismissed the Equal Protection, Fair Housing Act, privacy, and Pennsylvania Landlord and Tenant Act claims, and those portions of its order have also not been appealed.

Hazleton from disclosing the Doe Plaintiffs' identity information to the federal government. Hazleton further contends that Plaintiffs' claims are meritless, and that the ordinances are valid under federal and state law.

## III. JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291.

We review a district court's conclusions of law de novo and its factual findings for clear error. *See, e.g., McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009). We review a district court's grant of a motion to proceed anonymously and grant of a confidentiality order for abuse of discretion. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 371 & n.2 (3d Cir. 2008).

## IV. SEVERABILITY AND STANDING

We first address the threshold question of Plaintiffs' standing. Here, however, standing implicates the issue of severability – an issue which has yet to be explicitly discussed in this suit. As we explained in *Contractors Ass'n v. City of Philadelphia*, "[c]ourts considering constitutional challenges to

26

statutes often analyze standing problems in terms of the severability doctrine. . . . The severability doctrine governs whether [plaintiffs] have standing to challenge [an] entire [o]rdinance, or just [certain provisions]." 6 F.3d 990, 996 (3d Cir. 1993).

Severability, however, like any non-jurisdictional issue, can be waived, and it is clear that Hazleton has, with one exception, waived issues of severability here. The district court considered whether Plaintiffs have standing to challenge the "employment provisions" and the "housing provisions" of these ordinances as collective wholes, and conducted its merits inquiries accordingly. *See, e.g.*, *Lozano*, 496 F. Supp. 2d at 518 ("[T]he ordinances at issue have two distinct provisions, one directed to employment issues and one aimed at landlord/tenant issues, [and] we will discuss each topic separately with regard to pre-emption."). On appeal, Hazleton does not contest the district court's failure to further sever the ordinances. Rather, Hazleton's brief characterizes the ordinances the same way the district court did. Thus, Hazleton argues that Plaintiffs lack standing to challenge the "employment provisions" and the "housing provisions," and that the "employment provisions" and

27

the "housing provisions" are not pre-empted, without further differentiating among those provisions.[13]

The sole severability issue Hazleton has not waived concerns the IIRAO's private cause of action. Hazleton has argued that the private cause of action is severable from the rest of the IIRAO's "employment provisions" both in its brief and at oral argument. Severability of a local ordinance is a question of state law, and Pennsylvania law favors severability. *Contractors Ass'n*, 6 F.3d at 997. Additionally, there is a presumption in favor of severability where, as here, the ordinances contain a severability provision. *Id.* For an ordinance to be severable, "[t]he legislating body must have intended that the act or ordinance be separable and the statute or ordinance must be capable of separation in fact. The valid portion of the enactment must be independent and complete within itself." *Saulsbury v. Bethlehem Steel Co.*, 196 A.2d 664, 667 (Pa. 1964) (emphasis omitted).

---

[13] We note that Hazleton's waiver of this issue likely speaks to the merits of a severability analysis as well, as severability often turns significantly on intent. If Hazleton had truly intended each provision of the IIRAO and the RO to operate independently, and to stand or fall independently of the other provisions of this regulatory scheme, it surely would have pressed that point sometime during this litigation. It has not done so.

Here the IIRAO's severability provision indicates that Hazleton's City Council did intend the private cause of action provision to be severable from the balance of its regulatory scheme. Furthermore, the private cause of action is not intertwined with the other "employment provisions," most of which concern business licensing requirements. It can operate independently and is "capable of separation in fact." *Id.* We therefore conclude that it is severable. Accordingly, we will evaluate Plaintiffs' standing to challenge the IIRAO's private cause of action independently of their standing to challenge the other "employment provisions" and the "housing provisions."

In essence, the question of standing asks "whether the litigant[s] [are] entitled to have the court decide the merits of the dispute." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). As we will explain, we conclude that there is at least one Plaintiff with standing to challenge the employment and housing provisions of these ordinances. Accordingly, we must consider the merits of the challenges to those provisions. *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 53 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

However, as we will also explain, we find that no Plaintiff has standing to challenge the IIRAO's private cause of action. Accordingly, review of the legality of that provision must await a challenge by a plaintiff who can establish an Article III injury.

## A. General Principles of Standing

The irreducible minimum of any standing inquiry derives directly from Article III of the United States Constitution. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Article III limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2; *see also Lujan*, 504 U.S. at 559-60. The judicial power established by Article III is therefore not "an unconditioned authority to determine the constitutionality of legislative or executive acts." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 598 (2007) (internal quotation marks omitted). Rather, federal courts are permitted to address these questions only if actually adjudicating "the rights of individuals." *Id.* (internal quotation marks omitted). Thus, the inquiry into standing must focus on whether a claim is being brought "by a party whose interests entitle him to raise it." *Id.* (internal quotation marks omitted). A plaintiff's "interests" satisfy Article III when the following three elements

30

are present:

> First, the plaintiff must have suffered an injury in fact – an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of – the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560-61 (internal citations, quotation marks, and alterations omitted).

In addition to these constitutionally required elements of standing, federal courts have developed a body of self-imposed limitations on the exercise of their judicial power. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004); *see also Oxford Assocs. v. Waste Sys. Auth.*, 271 F.3d 140, 145 (3d Cir. 2001). Accordingly, "[e]ven in cases concededly within our jurisdiction under Article III," we will decline to decide the merits of a case when these "prudential standing" requirements are not satisfied. *Elk Grove Unified Sch. Dist.*, 542 U.S. at 11. Prudential standing encompasses: "the general prohibition on a litigant's raising another person's legal rights, the rule barring

adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751 (1984).

An organization wishing to bring suit on behalf of its members must satisfy a specific combination of constitutional and prudential standing requirements. *See United Food and Commercial Workers Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 556-57 (1996) (explaining that the first two prongs of the associational standing test are constitutional, while the third prong is prudential). To establish that it has "associational standing" and can represent its members' interests in federal court, an organization must show that:

> (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

Here, Plaintiffs claim that Lozano and the HHBA have

standing to challenge the employment provisions of the IIRAO, and that Lozano, the HHBA, and the Doe Plaintiffs have standing to challenge the housing provisions of the IIRAO and the RO.

## B. Constitutional Standing

## 1. The Employment Provisions

As discussed above, the IIRAO's employment provisions require businesses to submit affidavits affirming that they do not utilize the services of unlawful workers; incentivize, and in certain circumstances mandate, the use of E-Verify; create procedures for adjudicating independently of federal law whether a business has employed an unauthorized alien; and penalize a business for doing so by suspending its business license.

The district court held that Lozano had standing to challenge these provisions for himself, and that the HHBA had standing to challenge them on behalf of its member, Rudolfo Espinal.[14] Lozano is a landlord, and Espinal is a landlord and

_____

[14] Assuming the other requirements of associational standing are met, one member with standing is sufficient for an organization to have standing. *See Hunt*, 432 U.S. at 342 ("[A]n association may have standing solely as the representative of its

(continued...)

33

owner of a real estate agency. Both are business entities under the IIRAO,[15] and both sometimes hire contractors to perform work on their rental properties. Accordingly, the district court found that they faced imminent concrete injury, because if the IIRAO were enforced, they would be compelled "to comply with [its] employer requirements . . . adding a burden of time

---

[14](...continued)
members. . . . The association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.") (alteration in original) (internal quotation marks omitted) (emphasis added).

[15] The employment provisions of the IIRAO regulate the behavior of all "business entities," a term which as we noted above, is defined expansively and includes even those entities that do not have or need business licenses. At the same time, compliance with these provisions is primarily, although not entirely, coerced through regulating the provision of business licenses. Lozano and Espinal are plainly business entities under the IIRAO; however, neither has testified as to whether he has a business license.

We agree with the Court of Appeals for the Eighth Circuit when faced with the same issue in *Gray v. City of Valley Park*, 567 F.3d 976 (8th Cir. 2009), that this does not deprive them of standing. Regardless of whether these Plaintiffs have business licenses, the IIRAO applies to them as business entities, and they "must, as law-abiding citizens, comply and conform their conduct according to [the ordinance's] directives." *Id.* at 985; *see also id.* at 986 ("At the very least, as a business entity covered by the ordinance, [plaintiffs] may not knowingly recruit, hire for employment, or continue to employ, an unlawful worker to perform work within the City. And, when a valid complaint is lodged, [plaintiffs] would be required to . . . provide identity information to the . . . Code Enforcement Office.") (internal citation omitted).

34

and expense to [their] operations." *See Lozano*, 496 F. Supp. 2d at 489. Hazleton challenges the district court's conclusion on several grounds.

Hazleton's primary argument on appeal is that the "injury" these Plaintiffs face is nothing more than the "cost of compliance" with the IIRAO, and that this is a generalized burden insufficiently particularized to satisfy the injury-in-fact requirement of Article III. It is well-established that an injury must be particularized to support standing. A "particularized" injury is one that "affect[s] the plaintiff in a personal and individual way," *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 763 (3d Cir. 2009) (quoting *Lujan*, 504 U.S. at 560 n.1) (internal quotation marks omitted), and is established when a plaintiff shows that s/he has "sustained or is immediately in danger of sustaining some direct injury . . . and not merely that [s/]he suffers in some indefinite way in common with people generally," *Ams. United for Separation of Church & State v. Reagan*, 786 F.2d 194, 199 (3d Cir. 1986) (internal quotation marks omitted).

Thus, the Supreme Court has rejected attempts by taxpayers to bring suits challenging the government's use of tax

dollars. For instance, in *Frothingham v. Mellon*, 262 U.S. 447 (1923), the Supreme Court held that a taxpayer lacked standing to challenge a federal appropriations act that she alleged violated the Tenth Amendment. The Court explained that the harm a taxpayer suffers when the government unlawfully uses taxpayer funds is "shared with millions of others [and] comparatively minute and indeterminable." *Id.* at 487. Because such an injury is a matter "of public and not of individual concern," it is not particularized, and therefore insufficient to give rise to Article III standing. *Id.* The Court has reaffirmed this conclusion many times since, explaining that:

> a plaintiff raising only a generally available grievance about government – claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy.

*Lujan*, 504 U.S. at 573-74.

Hazleton attempts to transpose these principles into a quite different context. Hazleton suggests that because all business entities in Hazleton are required to comply with the IIRAO, the burden of complying with the ordinance is "generalized" and not "particularized." Accordingly, it argues

36

that Lozano and Espinal – and presumably all business entities in Hazleton – lack standing to challenge the IIRAO's provisions affecting them. The argument could not be more misguided.

Plaintiffs here are not members of the general public complaining of some indefinite and indeterminable harm, such as the unconstitutional expenditure of their tax-dollars. Rather, Lozano and Espinal are direct targets of an ordinance they allege to be unconstitutional, complaining of what that ordinance would compel them to do. Thus, the appropriate comparison is not to taxpayers seeking invalidation of government expenditures, but to taxpayers seeking invalidation of taxes imposed on them. As the Supreme Court explained in *Hein*, 551 U.S. at 599, it is incontrovertible that taxpayers in this second category have standing: "[o]f course, a taxpayer has standing to challenge the *collection* of a specific tax assessment as unconstitutional; being forced to pay such a tax causes a real and immediate economic injury to the individual taxpayer."

Furthermore, Hazleton's insistence that these Plaintiffs lack standing because their injuries are widely-shared (at least among business entities in Hazleton) is misplaced. The fact that an injury is widely-shared is not the primary focus of the

37

particularized inquiry. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 23-24 (1998). As the Supreme Court explained in *United States v. Students Challenging Regulatory Agency Procedures ("SCRAP")*, 412 U.S. 669, 688 (1973), "[t]o deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody. We cannot accept this conclusion." The question of particularity turns on the nature of the harm, not on the total number of persons affected.

Lozano and Espinal will not suffer in some "indefinite way in common with people generally" if the IIRAO is enforced. *Frothingham*, 262 U.S. at 488. Rather, they will be affected in a "personal and individual way" by what the IIRAO requires of them. *Lujan*, 504 U.S. at 561 n.1. Enforcement of the IIRAO would create coercive pressures compelling them to investigate the work authorization status of the prospective contractors they seek to hire. Additionally, they would be required to submit affidavits to Hazleton's Code Enforcement Office affirming that they do not knowingly utilize the services of "unlawful workers." Failure to comply with either directive

could result in significant sanctions. These costly requirements, imposed directly and purposefully on these Plaintiffs, are a particularized injury-in-fact.

Hazleton also argues that even if the "cost of compliance" is a theoretically sufficient injury under Article III, these Plaintiffs fail to show that the cost of compliance with the IIRAO is greater than the cost of compliance with federal law. Thus, argues Hazleton, these Plaintiffs fail to show that there would be any actual cost of compliance with the IIRAO itself. Hazleton is mistaken. Federal law certainly does not require anyone to submit an affidavit to Hazleton's Code Enforcement Office. Though relatively small, that cost is sufficient for standing purposes. "[A]n identifiable trifle is enough for standing." *See SCRAP*, 412 U.S. at 689 n.14 (internal quotation marks omitted).

The IIRAO is also much broader than federal law, and coerces as well as incentivizes different behaviors. Lozano and Espinal testified that they only hire workers to perform discrete repair projects on their rental properties as needed. *See* J.A. 1116, 1122 (Lozano has "problems with [his] roof" and intends to hire "a contractor" to make repairs.); J.A. 1216, 1221 (Espinal

39

intends to hire someone to do "plumbing" and "electrical" repairs as part of the ongoing renovations of his rental properties. He also anticipates hiring someone for tasks such as "shoveling snow."). Such workers would almost certainly be considered independent contractors under federal law. As we discuss in greater detail below, the federal requirement that employers verify the work authorization status of their employees does not apply to independent contractors. Thus, federal law would not require either Lozano or Espinal to determine such persons' work authorization status. In contrast, the IIRAO prohibits Plaintiff business owners from "permit[ting], dispatch[ing], or instruct[ing] any person who is an unlawful worker to perform work" (regardless of whether the person is an employee or an independent contractor), and thus compels them to verify the work authorization of any worker whose services they utilize. IIRAO § 4A; *see also* J.A. 1444. Therefore, we reject Hazleton's attempt to refute the standing of Lozano and Espinal by arguing that the IIRAO imposes no burdens beyond those imposed by federal law. It clearly does.

Lozano and Espinal have established that if the IIRAO is enforced, it will cause them particularized injury redressable by

this court. Since the employment provisions of the IIRAO apply to independent contractors, Lozano and Espinal (and therefore the HHBA) have standing to challenge those provisions. However, it is much less clear whether the private cause of action applies to independent contractors, and we must separately evaluate whether Lozano or Espinal have standing to challenge that provision

## 2. Private Cause of Action

Unlike the other employment provisions of the IIRAO, which impose restrictions on a business entity not only when it "hire[s] for employment, or continue[s] to employ" an employee, but also whenever it "permit[s], dispatch[es], or instruct[s] any person . . . to perform work," IIRAO § 4A, the private cause of action on its face affords rights only to an "aggrieved *employee*." IIRAO § 4E (emphasis added). Under Section 4E of the IIRAO, it is an "unfair business practice" for a business entity to terminate "any employee who is not an unlawful worker" while it continues to employ an unlawful worker. *Id.* If it does so, the business entity is liable to the "aggrieved employee" for treble damages. *Id.* Whereas the rest of the IIRAO speaks of "workers," the section creating the

41

private cause of action appears to inure solely to the benefit of "employees."

Lozano and Espinal have not testified that they currently employ anyone who would be considered an "employee," nor has either testified about any intent to do so. Moreover, even if they had – or even if we were to construe this section as also inuring to the benefit of discharged independent contractors – Lozano and Espinal have not testified that they have plans to hire *more than one* person, employee or contractor, at any one time, and the record is insufficient to support such a finding. Yet, the IIRAO's private cause of action arises only if at least two persons work for the same business entity at the same time. Additionally, unlike other provisions they testified about, Lozano and Espinal did not testify that they fear prosecution under the private cause of action provision or that they have any reason to fear such prosecution.

We realize, of course, that the threat of future prosecution can certainly be a sufficiently "imminent" injury to support Article III standing. *See Pa. v. W. Va.*, 262 U.S. 553, 593 (1923) ("One does not have to await the consummation of threatened injury to obtain preventive relief."). However, that

42

threat must be more than a possibility dependent on multiple contingencies that may never occur. *See, e.g.*, *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988) (explaining that fears of liability reliant on multiple contingencies do not give a plaintiff standing). Lozano and Espinal would be injured by Section 4E of the IIRAO only if they proceeded to hire multiple employees, terminated one while retaining another, and were sued by (or had reason to fear suit by) the terminated employee. This attenuated sequence of events is not even suggested by this record, and it is therefore too tenuous to support a conclusion that either has the requisite personal interest to establish a "case" or "controversy." Accordingly, we conclude that the district court lacked jurisdiction to consider the merits of these Plaintiffs' challenges to the IIRAO's private cause of action.

### 3. Housing Provisions

The housing provisions of the IIRAO prohibit the knowing or reckless harboring of "illegal aliens" (defined to include the knowing or reckless provision of rental housing); subject landlords who violate this prohibition to significant monetary sanctions; and invalidate any lease entered into by

persons lacking lawful immigration status. The RO requires all persons over the age of eighteen who seek to live in rented property to obtain an occupancy permit; makes possession of documentation of lawful immigration status a requirement for receiving that permit; prohibits landlords from renting to persons who lack a permit; and subjects landlords who do so to suspension of their rental license and a concomitant prohibition on collecting rent from the dwelling units involved.

The district court held that Lozano, the HHBA (again on behalf of its member Espinal), and the Doe Plaintiffs have standing as landlords and tenants to challenge the housing provisions of the IIRAO and the RO.

**a. Landlord Plaintiffs**

The district court concluded that landlords Lozano and Espinal had suffered a constitutionally sufficient injury-in-fact because the housing provisions made it more difficult for them to rent apartments. The court also concluded they had standing because Hazleton's enforcement of the housing provisions would directly impose certain requirements on them, costing them both time and money. *See Lozano*, 496 F. Supp. 2d at 488-89. Hazleton contests the court's conclusions on several

44

grounds.

Hazleton first argues that the record fails to support the district court's finding that the housing provisions made it more difficult for Lozano and Espinal to rent their properties. According to Hazleton, the record reveals that the landlords had the same "mixed success" in renting apartments both before and after passage of the ordinances. Hazleton's Br. 23. Hazleton therefore claims that Lozano and Espinal have suffered no injury at all. We cannot agree.

The district court's finding that both Lozano and Espinal had more difficulty finding tenants for their properties following passage of the IIRAO and the RO is supported by the record, and certainly not clearly erroneous. Lozano testified that tenants who had been renting from him since he acquired his rental property in 2005 "ran away" upon learning about the ordinances in mid-2006. J.A. 1108. Lozano further testified that he has been able to find tenants only sporadically since then, and that at least one prospective tenant, who had been quite interested in an apartment, reacted with concern and quickly departed after Lozano informed him about the requirements of the IIRAO and the RO. J.A. 1111-12. Espinal similarly testified that he has

45

had more difficulty in renting apartments since passage of the ordinances, and that on at least one occasion, he showed an apartment to potential tenants, who "were going to take [it]," but after telling these applicants about the ordinances, "they never called [him] back." J.A. 1215. The record therefore supports the district court's conclusion that Lozano and Espinal suffered sufficient injury to establish Article III standing.

Hazleton next argues that even if Lozano and Espinal did lose tenants and rental income because of these ordinances, such an injury is not "legally cognizable" because landlords have no right to rent to illegal aliens. Hazleton makes the rather hyperbolic metaphor of comparing these Plaintiffs to "drug dealers" asserting a claim to the proceeds of their unlawful activity. The City states: "[j]ust as a drug dealer has no legally-cognizable interest in income derived from violations of federal drug laws, a landlord has no legally-cognizable interest in income derived from continuing violations of federal immigration law." Hazleton's Br. 24. Hazleton's comparison is as regrettable as it is unsound.

It is unfortunate that we must point out that there is no evidence in the record that the prospective tenants who chose

46

not to rent from Plaintiffs were here unlawfully, as Hazleton's argument presumes. There are certainly other reasons why such invasive ordinances might dissuade a prospective tenant from renting in Hazleton. However, even if we were to assume that all deterred tenants were here unlawfully, we would still conclude that Plaintiffs assert an injury cognizable under the law.

By comparing landlords to persons who sell drugs in direct contravention of federal law, Hazleton distorts both the applicable law and the interests these Plaintiffs assert. Federal law simply does not prohibit landlords from renting (in the ordinary course of business) to persons who lack lawful immigration status. Nor does federal law directly prohibit persons lacking lawful status from renting apartments. As we discuss in further detail below, there is a federal prohibition against "harboring" of aliens lacking lawful presence. However, this prohibition is not nearly so broad as Hazleton's, and has never been held to apply to a landlord who does nothing more than rent to a tenant who happens to be here unlawfully. In light of these realities, we think the interest that these Plaintiffs assert is more appropriately characterized as an interest in continuing

47

to operate their rental businesses consistent with the less costly mandates of federal law, and that is an interest which supports Article III standing.

Hazleton also argues that these Plaintiffs fail to establish that the IIRAO and the RO caused whatever injury they have suffered because actions of independent third-parties (the potential tenants) are responsible for that injury, not the ordinances themselves. Hazleton draws its argument from the discussion of causation in *Lujan*. There, the Supreme Court explained that when the "plaintiff is himself an object" of a challenged government action, "there is ordinarily little question that the action . . . has caused him injury, and that a judgment . . . will redress it." *Lujan*, 504 U.S. at 561-62. However, when

> a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction – and perhaps on the response of others as well. . . . Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily substantially more difficult to establish.

*Lujan*, 504 U.S. at 562 (internal quotation marks omitted).

48

Hazleton contends that the landlord Plaintiffs cannot satisfy this higher burden.

In *Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000), we discussed when the regulation of a third-party "causes" a plaintiff's injury for the purposes of Article III. There, Pennsylvania had amended its Liquor Code to impose criminal sanctions on businesses that advertised alcoholic beverages in publications directed at educational institutions. The Pitt News, a student-run newspaper at the University of Pittsburgh, sued to enjoin enforcement of this amendment, and asserted standing based on the fact that its advertising revenues had suffered because of advertisers' compliance with the law. The district court held that "indirect economic effects resulting from a regulation aimed at third parties" were insufficient to give The Pitt News standing. *Id.* at 358.

In reversing that ruling, we explained that the advertisers would not have cancelled their contracts with The Pitt News were it not for the regulation. The fact that advertisers would cancel their contracts, thereby reducing advertising revenues, "was not only reasonably foreseeable when the Commonwealth decided to enact and enforce [the Act], it was the very goal of

49

the statute." *Id*. at 361 (internal citation omitted). Accordingly, we concluded that the injury the newspaper suffered was "fairly traceable" to enforcement of the statute against its advertisers.

The situation in *Pitt News* is analogous to the situation here. The housing provisions of the IIRAO and the RO have already deterred certain renters from contracting for housing with Lozano and Espinal, and these ordinances will continue to deter other renters if they are enforced. This deterrence "was not only reasonably foreseeable" when Hazleton enacted these ordinances, it was Hazleton's "very goal." *Id*. The injuries Lozano and Espinal assert are a direct, predictable, and anticipated consequence of the regulation. Accordingly, their injuries are "fairly traceable" to the ordinances.

Moreover, Hazleton's argument ignores that Lozano and Espinal are not just directly impacted by the ordinances, but directly regulated as well. The housing provisions of the IIRAO and the RO regulate *both* tenants and landlords. Although the injury on which Hazleton focuses, the injury of lost rental income, is caused by the requirements imposed on tenants, the district court found, and we certainly agree, that these landlords would be equally injured by the requirements the IIRAO and the

RO impose on them. Thus, even if we agreed with all of Hazleton's arguments thus far, we would still conclude that Lozano and Espinal have standing. The housing provisions of the IIRAO and the RO regulate the ability of landlords to contract with certain persons. They require landlords to explain the ordinances to all prospective renters and to examine those renters' occupancy permits. More generally, they compel landlords to act as local enforcers of immigration law in ways that far exceed their obligations under federal law. Compliance with these requirements elevates the cost of doing business as a landlord, and that alone gives them Article III standing.[16]

---

[16] We note, however, that the RO explicitly exempts from its registration and license requirements those "[p]roperties which consist of a double home, half of which is let for occupancy and half of which is Owner-occupied as the Owner's residence." RO § 11d. At trial, Lozano testified that he owns a "two-family" home. J.A. 1107. He lives in one unit with his family, and rents out the other unit, which is subdivided into two separate apartments, to help him pay the mortgage. *See* J.A. 1107-08. To our knowledge, the parties have not raised whether the "double home" exception applies to Lozano, and the district court did not address the issue. If that exception does apply, Lozano could not establish a sufficient injury to challenge the RO. *See Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399, 405 (3d Cir. 2005) (explaining that because standing is a jurisdictional issue, it cannot be waived, and the court must, when necessary, consider it *sua sponte*). However, even assuming that Lozano is exempt from the RO, other Plaintiffs would still have standing to challenge that ordinance, and we therefore would still have jurisdiction to review it.

**b. Tenant Plaintiffs**

Because "[t]he loss (or imminent loss) of one's apartment and the inability to rent a new one is certainly an actual and concrete injury," caused by the ordinances and redressable by the court, the district court concluded that the Doe Plaintiffs, who lack lawful immigration status, also have standing to challenge the housing provisions of the IIRAO and the RO. *Lozano*, 496 F. Supp. 2d at 497-98.

Hazleton first argues that the district court erred in finding that John Does 3 and 7 and Jane Doe 5 face imminent injury. According to Hazleton, their fears of eviction are merely conjectural because "none of them have been evicted or have received any threat or warning that they might be evicted in the future."[17] Hazleton's Br. 20. We are entirely unconvinced.

---

[17] Hazleton does not extend this argument to John Doe 1, which is wise since John Doe 1 was evicted by his landlord because of these ordinances. *See* J.A. 831-32. Hazleton does challenge John Doe 1's standing, however, based on its contention that John Doe 1 is lawfully present in this country. We recognize that the record contains conflicting testimony as to John Doe 1's immigration status. On the one hand, John Doe 1 testified that his father, a United States citizen, submitted a "petition" to make John Doe 1 a "legal resident," and that the United States government approved that petition. J.A. 808-09. On the other hand, John Doe 1 testified that he is unsure of his immigration status and his work authorization, that he believes he is removable, and that he is "not here legally." *See* J.A. 809-10, 832. We therefore cannot conclude
(continued...)

These Plaintiffs all testified that they feared losing their apartments and having to move elsewhere. *See* J.A. 888, 929, 951. Hazleton cites John Doe 3's testimony that he did not expect to be evicted because his landlord "doesn't care much about" the ordinances, J.A. 888, as evidence that he faces no imminent injury. However, Hazleton misconstrues this testimony. John Doe 3 later explained that he had been told by his landlord's agent that his landlord did not expect the ordinances to ever go into effect, and for that reason, John Doe 3 had been unconcerned. *See* J.A. 889-90. He also testified that he has no reason to believe that his landlord would not comply with the ordinances if they are enforced. J.A. 889-90. Given the harsh sanctions the IIRAO and the RO would impose on any landlord who rented to him or the other Doe Plaintiffs, such fears are plainly well-founded. The possibility of eviction is therefore much more than "conjecture." A plaintiff need only show "a realistic danger of sustaining a direct injury as a result

[17](...continued)
that the district court's findings as to the legitimacy of his fears were clearly erroneous. Regardless of John Doe 1's precise legal status, we think that he has established standing. He has been evicted because of the ordinances, and his own understanding of – and his ability to prove – his status is sufficiently uncertain that he is quite likely to suffer further injury if the ordinances are enforced.

of the statute's operation or enforcement," and the Doe Plaintiffs clearly do so. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

Hazleton also raises here the converse of its argument above: it contends that the Doe Plaintiffs lack standing because their claimed injuries would be caused by third-party landlords, and not the ordinances. This verges on the ridiculous. Just as Hazleton's ordinances compel tenants not to rent from Plaintiff landlords, they compel landlords not to rent to Plaintiff tenants. The Doe Plaintiffs' fears that their landlords will not rent to them – because the IIRAO and the RO *require* those landlords not rent to them – are certainly "fairly traceable" to the ordinances. Additionally, as Hazleton well knows, these ordinances directly regulate tenants as well, and therefore would injure the Doe Plaintiffs regardless of their landlords' reactions to them. The IIRAO and the RO would invalidate their leases, and would require them to pay a fee and provide documentation (which they lack) in order to continue renting apartments in Hazleton. These injuries easily satisfy Article III.

Finally, Hazleton argues that the Doe Plaintiffs fail to establish redressability because, even if this Court struck down

the ordinances, the Doe Plaintiffs would still be subject to removal. According to Hazleton, this Court cannot grant "a remedy that takes the Doe [P]laintiffs out of legal jeopardy. They will still be in violation of federal law and subject to removal." Hazleton's Br. 21. Hazleton greatly overstates the demands of this element of constitutional standing.

As the Supreme Court explained in *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982), "a plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." Redressability therefore does not require that a court be able to solve all of a plaintiff's woes. Rather, we need only be able to redress, to some extent, the specific injury underlying the suit. *See Mass. v. EPA*, 549 U.S. 497, 526 (2007) (holding that redressability prong was satisfied because risk of global climate change would be reduced "to some extent" by relief requested). By permanently enjoining enforcement of the housing provisions of the IIRAO and the RO, this court can provide meaningful redress for the injury the Doe Plaintiffs assert. Such relief would substantially decrease the likelihood that they will

be evicted and/or unable to procure rental housing while they remain in the United States. That is more than sufficient to establish standing.

Because Lozano, HHBA member Espinal, and the Doe Plaintiffs will suffer injury caused by the ordinances and redressable by the court, we conclude that they have Article III standing to challenge the housing provisions of the IIRAO and the RO.

## C. Prudential Standing

Even when a plaintiff satisfies Article III standing requirements, federal courts may nonetheless decline to consider that plaintiff's claims for prudential reasons. Hazleton contends that there are two prudential considerations which counsel restraint here.

Hazleton first argues that Plaintiffs lack prudential standing because they do not fall within the "zone of interests" protected by federal immigration law. Hazleton misstates the applicable zone of interests inquiry in the pre-emption context.

The Supreme Court has explained that a plaintiff may bring suit only when the interests s/he asserts are "arguably within the zone of interests to be protected or regulated by the

statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). This limitation on standing arose in suits challenging agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, but has since been employed more broadly. *See Bennett v. Spear*, 520 U.S. 154, 163 (1997) (The "zone-of-interests test [was first applied] to suits under the APA, but later cases have applied it also in suits not involving review of federal administrative action and have specifically listed it among other prudential standing requirements of general application.") (internal citations omitted). However, outside of the administrative law context, the test may have different permutations, *see Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc.*, 165 F.3d 221, 226 (3d Cir. 1998), and "the breadth of the zone of interests [will vary] according to the provisions of law at issue," *Bennett*, 520 U.S. at 163.

Thus, in the pre-emption context, we have explained that the relevant prudential inquiry is *not* whether a plaintiff's interests fall within the zone protected by the allegedly pre-empting federal provision, in this case, federal immigration law. In *St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands*,

57

218 F.3d 232 (3d Cir. 2000), several employer organizations brought suit to enjoin a Virgin Islands law establishing that employees could only be terminated for cause. The plaintiffs alleged that this law was pre-empted by the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151-169. On appeal, defendants argued that plaintiffs lacked prudential standing to invoke the pre-emptive effect of the NLRA, because the NLRA's zone of interests did not encompass employers' interests in terminating their employees. We agreed with the defendants' characterization of the NLRA's zone of interests, but found this no bar to employers' prudential standing. We explained:

> We know of no governing authority to the effect that the federal statutory provision which allegedly preempts enforcement of local legislation by conflict must confer a right on the party that argues in favor of preemption. On the contrary, a state or territorial law can be unenforceable as preempted by federal law even when the federal law secures no individual substantive rights for the party arguing preemption.

*Id.* at 241.

Pre-emption suits arise under the Supremacy Clause and vindicate the interests of that Clause, not the interests of the pre-

58

empting federal provision. Therefore, the appropriate prudential inquiry in pre-emption cases (if any such inquiry is necessary at all) must be whether the plaintiff's interests fall within the zone protected by the Supremacy Clause itself. *See, e.g.*, *Wilderness Soc'y v. Kane Cnty.*, 581 F.3d 1198, 1217 n.11 (10th Cir. 2009) (declining to decide if zone of interests test applies in pre-emption cases, but emphasizing that if it does, "the relevant zone of interest is that of the Supremacy Clause and not of the allegedly preempting federal statute"); *Pharm. Research & Mfrs. v. Concannon*, 249 F.3d 66, 73 (1st Cir. 2001) (In a pre-emption case, "it is the interests protected by the Supremacy Clause, not by the preempting statute, that are at issue."). These interests, which are no less than our society's interest in a working federalism, are societal, not individual. Accordingly, all Plaintiffs fall within their breadth, and have prudential standing here.

Hazleton also argues that we should, as a matter of prudential standing, refuse to adjudicate the Doe Plaintiffs' claims because they concede that they lack lawful immigration status. Hazleton relies on *National Coalition of Latino Clergy, Inc. v. Henry*, No. 07-CV-613, 2007 WL 4390650 (N.D. Okla.

59

Dec. 12, 2007), the unpublished decision of a lone federal district court as support for its contention.[18]

In *Henry*, the District Court for the Northern District of Oklahoma considered challenges to the Oklahoma Taxpayer and Citizen Protection Act of 2007, a law which mirrors the IIRAO in several respects (and which, in subsequently-filed litigation, *Chamber of Commerce v. Edmondson,* 594 F.3d 742 (10th Cir. 2010), was preliminarily enjoined in part). The court concluded that those plaintiffs lacking lawful immigration status had Article III standing, but nonetheless held that it would not consider their claims for prudential reasons. Explaining that courts have traditionally refused to entertain cases brought by plaintiffs with "unclean hands," it reasoned that the "illegal alien Plaintiffs seek nothing more than to use this Court as a vehicle for their continued unlawful presence in this country." *Id.*, at *9. To allow them to do so, the court concluded, would make it an "abetter of iniquity," a result it found "unpalatable." *Id.* The court thus adopted "a new, and narrow, prudential

---

[18] As a general rule, we do not consider arguments arising out of unpublished decisions, and do so here solely for the purposes of putting to bed Hazleton's argument, which we find particularly troubling.

limitation" on standing:

> [a]n illegal alien, in willful violation of federal immigration law, is without standing to challenge the constitutionality of a state law, when compliance with federal law would absolve the illegal alien's constitutional dilemma – particularly when the challenged state law was enacted to discourage violation of the federal immigration law.

*Id.*

Hazleton argues that, for the reasons articulated in *Henry*, we "too must prudentially decline to take jurisdiction with respect to the Doe Appellees." Hazleton's Br. 19. *Henry's* invented bar to judicial access is entirely improper, and we will not accept Hazleton's invitation to duplicate that error here.

The *Henry* decision, both in substance and tone, fails to appreciate that whatever a person's immigration status, "an alien is surely a 'person'" entitled to Due Process Clause protections. *Plyler*, 457 U.S. at 210; *see also Wolff v. McDonnell*, 418 U.S. 539, 579 (1974) ("The right of access to the courts . . . is founded in the Due Process Clause and assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights."). The Supreme Court therefore has certainly considered

61

judicial challenges brought by persons lacking lawful immigration status, *see, e.g.*, *Plyler*, even when "compliance with federal law" would have absolved "the illegal alien's constitutional dilemma," *Henry*, 2007 WL 4390650, at *9.

*Henry* defends its rule by claiming that it would not deny persons without lawful status *all* access to the courts, as they would retain prudential standing to sue for harms *unrelated* to their status. But this caveat assures little. As this case demonstrates, all it takes for a harm to become "related to" a person's immigration status is for some legislative body to decree it so. The scope of these aliens' rights would therefore, under *Henry's* reasoning, be entirely dependent on the will of state and local legislatures, which could tie any consequence of their choosing to unlawful status and never face judicial review.

The Doe Plaintiffs satisfy Article III standing requirements, and the prudential standing requirements of general applicability set forth by the Supreme Court. Accordingly, we will address their claims. However, two more preliminary issues must be resolved before we do so.

## V. ANONYMITY AND CONFIDENTIALITY

Hazleton argues that the district court erred in permitting

those Plaintiffs lacking lawful immigration status to proceed using a "John Doe" or "Jane Doe" pseudonym. We disagree.

In *C.A.R.S. Protection Plus*, we explained that although "the use of pseudonyms to conceal a plaintiff's identity has no explicit sanction in the federal rules," the Supreme Court has "given the practice implicit recognition." 527 F.3d at 371 n.2. We thus concluded that "the decision whether to allow a plaintiff to proceed anonymously rests within the sound discretion of the court." *Id.*

In deciding whether to permit those Plaintiffs with concerns about the legality of their immigration status to proceed anonymously, the district court surveyed case law within this Circuit and identified nine separate factors courts have used to decide whether anonymity is appropriate. *See Lozano*, 496 F. Supp. 2d at 506. The court then engaged in a thorough analysis of each of these factors, and concluded that the factors favoring anonymity outweighed those favoring disclosure. Specifically, the court found that ethnic tensions had escalated in Hazleton since enactment of the ordinances, and that the named Plaintiffs had been harassed and intimidated for

their involvement in this litigation.[19]  *See id.* at 508-10.  The court concluded that the Doe Plaintiffs, because of their unlawful status, would face an "exponentially greater" risk of harassment, and even physical danger, if their identities were revealed. *Id.* at 510.  The court also noted that the litigation was in the public interest, and reasoned that the Doe Plaintiffs, as well as prospective litigants lacking lawful status, would be deterred from bringing cases clarifying constitutional rights, if doing so required alerting federal immigration authorities to their presence.  *See id.* at 511-12.  Finally, the court explained

_____

[19] Lozano, for example, testified that hate mail was sent to his home three separate times.  One letter "contained a clipping from a newspaper describing the [alleged] effects of illegal immigration as well as a picture of a 'warrior' wearing 'a huge Mexican hat.'  Scrawled near this picture were the phrases, '[s]ubhuman spic scum' and '[i]f it is brown, flush it down.'" *Lozano*, 496 F. Supp. 2d at 510 (alterations in original) (internal quotation marks and citation omitted).  This letter also contained a link to a website proclaiming itself "the Official Home Page of the National Socialist Movement, an organization dedicated to the preservation of our Proud Aryan Heritage, and the creation of a National Socialist Society in America and around the world." *Id.* at 510 n.34 (internal quotation marks omitted).  The district court noted that this sort of harassment extended even to people who were merely perceived as being connected to the lawsuit, even if this perception was not rooted in fact.  Amilcar Arroyo, a United States citizen who publishes a Hazleton-based Spanish-language newspaper, was publically harassed when he tried to cover a rally in support of the ordinances.  Based on a rumor that he was a plaintiff in this suit, rally participants gathered around him shouting, "get out of the country" and "traitor." *Id.* at 510 (internal quotation marks omitted).  Police escorted Arroyo from the rally for his own protection. *Id.*

that because the Doe Plaintiffs' identity information was not central to their claims, restricting Hazleton's access to that information would not be prejudicial. *See id.* at 513. We agree with each of these conclusions, and think it clear that given the environment in Hazleton following enactment of these ordinances, the court did not abuse its discretion in permitting the Doe Plaintiffs to proceed using pseudonyms.

Relatedly, Hazleton also argues that the district court violated 8 U.S.C. § 1373(a) by entering an order prohibiting the parties from disclosing "information obtained during discovery regarding the John and Jane Doe plaintiffs." J.A. 211. Section 1373(a) provides:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. § 1373(a). Hazleton argues that because the district court is an entity of the federal government, it was prohibited by this section from preventing Hazleton from communicating with federal immigration authorities about "the citizenship or

65

immigration status" of the Doe Plaintiffs.

Although we are not convinced that § 1373(a) does, or could, limit the inherent powers of federal courts in the way Hazleton suggests, we need not reach this question because Hazleton's argument fails for a more fundamental reason. Under the confidentiality agreement the parties eventually entered into, the Doe Plaintiffs agreed to reveal their identities only to Hazleton's attorneys, and not to Hazleton officials. *See* J.A. 692-707. Consequently, Hazleton never learned these Plaintiffs' identities or their immigration status. The district court simply could not have prohibited Hazleton from communicating with the federal government about information that Hazleton never knew.

## VI. DISCUSSION

Having resolved these preliminary issues, we can turn to the merits of the claims before us. Although our reasoning differs from that of the district court, we agree that the provisions of the ordinances which we have jurisdiction to review are pre-empted by federal immigration law and unconstitutional under the Supremacy Clause. Because that conclusion turns on the relationship between the ordinances and

66

federal immigration law, we begin our inquiry into the merits of this appeal by briefly laying out the parameters of that law.

## A. Federal Immigration Law

## 1. The Immigration and Nationality Act

The primary body of federal immigration law is contained in the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-537, enacted in 1952, and amended many times thereafter. The INA sets forth the criteria by which "aliens," defined as "any person not a citizen or a national of the United States," 8 U.S.C. § 1101(a)(3), may enter, visit, and reside in this country.

Under the INA, there are three primary categories of aliens who may lawfully enter and/or spend time within the United States: (1) "nonimmigrants," who are persons admitted for a limited purpose and for a limited amount of time, such as visitors for pleasure, students, diplomats, and temporary workers, *see* 8 U.S.C. § 1101(a)(15); (2) "immigrants," who are persons admitted as (or after admission, become) lawful permanent residents of the United States based on, *inter alia*, family, employment, or diversity characteristics, *see* 8 U.S.C. § 1151; and (3) "refugees" and "asylees," who are persons

67

admitted to and permitted to stay for some time in the United States because of humanitarian concerns, *see* 8 U.S.C. §§ 1157-58.[20] Aliens wishing to be legally admitted into the United States must satisfy specific eligibility criteria in one of these categories, and also not be barred by other provisions of federal law that determine inadmissibility. Congress has determined that non-citizens who, *inter alia*, have certain health conditions, have been convicted of certain crimes, present security concerns, or have been recently removed from the United States, are inadmissible, *see* 8 U.S.C. § 1182, and if detained when attempting to enter or reenter the country, may be subject to expedited removal, *see* 8 U.S.C. § 1225.

Despite the carefully designed system for lawful entry described above, persons lacking lawful immigration status are obviously still present in the United States. As the Supreme Court explained almost thirty years ago: "[s]heer incapability or lax enforcement of the laws barring entry into this country . . .

---

[20] Congress has also ratified treaties pursuant to which persons may be admitted on humanitarian grounds even if they do not satisfy the statutory definition of "refugee" set forth in the INA. *See* United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Apr. 18, 1988, 1465 U.N.T.S. 85.

has resulted in the creation of a substantial 'shadow population' . . . within our borders." *Plyler*, 457 U.S. at 218. Such persons may lack lawful status because they entered the United States illegally, either by failing to register with immigration authorities or by failing to disclose information that would have rendered them inadmissible when they entered. *See* 8 U.S.C. § 1227. In addition, aliens who entered legally may thereafter lose lawful status, either by failing to adhere to a condition of admission, or by committing prohibited acts (such as certain criminal offenses) after being admitted. *See id.*

Persons here unlawfully are subject to removal from the country. Removal proceedings are initiated at the discretion of the Department of Homeland Security ("DHS").[21] *See Juarez v.*

---

[21] Prior to 2003, the Immigration and Naturalization Service ("INS"), which operated under the Department of Justice, administered both immigration services and immigration enforcement. On March 1, 2003, Congress abolished the INS. Pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135, that agency's functions were transferred to three separate agencies within the newly created Department of Homeland Security: U.S. Citizenship and Immigration Services ("USCIS"), which performs immigration and naturalization services, U.S. Immigration and Customs Enforcement ("ICE"), which enforces federal immigration and customs laws, and U.S. Customs and Border Protection ("CBP"), which monitors and secures the country's borders. Older documents may continue to refer to the pre-2003 administrative structure, and citations to them should be understood in that context.

*Holder*, 599 F.3d 560, 566 (7th Cir. 2010) ("[T]he decision when to initiate removal proceedings is committed to the discretion of immigration authorities." (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 489 (1999))). Although certain aliens are subject to more expedited removal proceedings,[22] for all others, section 240 of the INA sets forth the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3).

Under section 240, an alien facing removal is entitled to a hearing before an immigration judge and is provided numerous procedural protections during that hearing, including notice, the opportunity to present and examine evidence, and the opportunity to be represented by counsel (at the alien's expense). *See* 8 U.S.C. § 1229a. At the conclusion of a removal hearing, the presiding immigration judge must decide, based on

---

[22] As noted above, inadmissible aliens detained at the borders of the United States, or others deemed not to have been "admitted" to the country, may be subject to expedited removal. *See* 8 U.S.C. § 1225. In addition, expedited removal procedures apply to certain aliens already within the country who have been convicted of congressionally-defined crimes. *See* 8 U.S.C. § 1228.

the evidence produced during the hearing, whether the alien is removable, *see* 8 U.S.C. § 1229a(c)(1)(A), and if so, whether s/he should be ordered removed, or should be afforded relief from removal. Such relief can include postponement of removal, cancellation of removal, or even adjustment of status to that of lawful permanent resident. See 8 U.S.C. §§ 1229a(c)(4), 1229b.

In sum, while any alien who is in the United States unlawfully faces the prospect of removal proceedings being initiated against her/him, whether s/he will actually be ordered removed is never a certainty until all legal proceedings have concluded. Moreover, even after an order of removal issues, the possibility remains that no country will accept the alien. Under such circumstances, the Constitution limits the government's authority to detain someone in anticipation of removal if there is no significant likelihood of removal in the reasonably foreseeable future. *See Zadvydas v. Davis*, 533 U.S. 678, 699 (2001).[23]

---

[23] In *Zadvydas*, the Court addressed the cases of two aliens who had been ordered removed from the United States, but who, for various reasons, no other country would accept. The government sought to continue detaining them nonetheless. The

(continued...)

71

The INA, as amended, also prohibits the "harboring" of aliens lacking lawful immigration status. It provides that any person who "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection . . . such alien in any place, including any building or any means or transportation" shall be subject to criminal penalties. 8 U.S.C. § 1324(a)(1)(A)(iii).

For decades, the INA contained no specific prohibition against the employment of aliens lacking legal status. Rather, regulation of the employment of aliens not lawfully present was at most a "peripheral concern." *DeCanas v. Bica*, 424 U.S. 351, 360 (1976). This changed in 1986, when Congress amended the INA through enactment of the Immigration Reform and Control Act ("IRCA"), Pub. L. No. 99-603, 100 Stat. 3359 (codified at 8 U.S.C. §§ 1324a-1324b). IRCA "forcefully made combating the employment of illegal aliens central to the policy of

_____

[23](...continued)
Court held that the Due Process Clause imposed reasonableness limits on post-removal-period detention, and thus that the government could not continue the aliens' detention indefinitely if there was "no significant likelihood of removal in the reasonably foreseeable future." 533 U.S. at 701.

immigration law." *Hoffman Plastic Compounds, Inc. v. National Labor Relations Board*, 535 U.S. 137, 147 (2002) (internal quotation marks and alterations omitted).

## 2. The Immigration Reform and Control Act

IRCA regulates the employment of "unauthorized aliens," a term of art defined by the statute as those aliens neither "lawfully admitted for permanent residence" nor "authorized to be . . . employed by this chapter or by the Attorney General." 8 U.S.C. § 1324a(h)(3). IRCA makes it unlawful to knowingly hire or continue to employ an unauthorized alien, or to hire anyone for employment without complying with the work authorization verification system created by the statute. 8 U.S.C. § 1324a(a)(1)-(2). This verification system, often referred to as the "I-9 process," requires that an employer examine certain documents that establish both identity and employment authorization for new employees. *See* 8 U.S.C. § 1324a(b). The employer must then fill out an I-9 form attesting that s/he reviewed these documents, that they reasonably appear to be genuine, and that to the best of the employer's knowledge, the employee is authorized to work in the United States. *See id.* Although employers are required

to verify the work authorization of all *employees*, Congress did not extend this requirement to independent contractors. *See* 8 U.S.C. § 1324a(a)(1) (making unlawful the knowing "employment" of an unauthorized alien, and the hiring of an employee for "employment" without verifying the employee's work authorization); 8 C.F.R. § 274a.1(f) (specifically excluding "independent contractors" from the definition of "employee"); 8 C.F.R. § 274a.1(g) (specifically excluding a "person or entity using . . . contract labor" from the definition of "employer").

The I-9 "verification system is critical to the IRCA regime." *Hoffman Plastic Compounds*, 535 U.S. at 147-48. Not only is failure to use the system illegal, but use of the system provides an affirmative defense to a charge of knowingly employing an unauthorized alien. *See* 8 U.S.C. § 1324a(a)(3). Thus, employers who use the I-9 process in good faith to verify the work authorization of employees are presumed not to have knowingly employed someone unauthorized to work in this country. In enacting IRCA, Congress required the President to monitor the security and efficacy of this verification system. *See* 8 U.S.C. § 1324a(d). Congress also imposed limits on the President's ability to change it. *Id.*

In addition to relying on the I-9 verification system, IRCA uses public monitoring, prosecution, and sanctions to deter employment of unauthorized aliens. IRCA provides for the creation of procedures through which members of the public may file complaints about potential violations; it authorizes immigration officers to investigate these complaints; and it creates a comprehensive hearing and appeals process through which complaints are evaluated and adjudicated by administrative law judges. *See* 8 U.S.C. § 1324a(e)(1)-(3).

Under IRCA, an employer who knowingly hires an unauthorized alien shall be ordered to cease and desist the violation, and to pay between $250 and $2000 per unauthorized alien for a first offense, between $2000 and $5000 per unauthorized alien for a second offense, and between $3000 and $10,000 per unauthorized alien for a third or greater offense. 8 U.S.C. § 1324a(e)(4). An employer who fails to verify the work authorization of its employees can be ordered to pay between $100 and $1000 for each person whose authorization it failed to authenticate. 8 U.S.C. § 1324a(e)(5). Employers who engage in a "pattern or practice" of hiring unauthorized aliens shall be fined up to $3000 per unauthorized alien, imprisoned for not

75

more than six months, or both.  8 U.S.C. § 1324a(f)(1).

IRCA expressly pre-empts states and localities from imposing additional "civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2).

Because of its concern that prohibiting the employment of unauthorized aliens  might result in employment discrimination against authorized workers who appear to be foreign, Congress included significant anti-discrimination protections in IRCA.  *See* 8 U.S.C. § 1324b.[24]  The statute provides that, with certain limited exceptions, it is an "unfair immigration-related employment practice" to discriminate in hiring on the basis of national origin or citizenship status.  8

---

[24]  8 U.S.C. § 1324b provides in relevant part that:

[with certain limited exceptions, it] is an unfair immigration-related employment practice for a person or other entity to discriminate against any individual (other than an unauthorized alien, as defined in section 1324a(h)(3) of this title) with respect to the hiring, or recruitment or referral for a fee, of the individual for employment or the discharging of the individual from employment – (A) because of such individual's national origin, or (B) in the case of a protected individual . . . because of such individual's citizenship status.

8 U.S.C. § 1324b(a).  Any person adversely-affected by an unfair immigration-related employment practice "may file a charge respecting such practice or violation."  8 U.S.C. § 1324b(b)(1).

U.S.C. § 1324b(a)(1). Congress put teeth into this provision by creating the office of a "Special Counsel" to investigate and prosecute such offenses, and it *required* that the President fill that position "with the advice and consent of the Senate." 8 U.S.C. § 1324b(c).[25] Congress also authorized immigration judges to punish those who violate IRCA's anti-discrimination mandate by imposing civil fines equivalent in amount to those imposed for knowingly hiring unauthorized aliens. *Compare* 8 U.S.C. § 1324a(e)(4)(A)(i)-(iii) *with* 8 U.S.C. § 1324b(g)(2)(B)(iv)(I)-(III).[26]

---

[25] 8 U.S.C. § 1324b(c) provides in relevant part that "[t]he President shall appoint, by and with the advice and consent of the Senate, a Special Counsel for Immigration-Related Unfair Employment Practices." 8 U.S.C. § 1324b(c)(1). The Special Counsel "shall be responsible for investigation of charges and issuance of complaints under this section and in respect of the prosecution of all such complaints before administrative law judges." 8 U.S.C. § 1324b(c)(2).

[26] There are some differences between the two sections. The imposition of monetary sanctions under § 1324a is mandatory, but discretionary under § 1324b. *Compare* 8 U.S.C. § 1324a(e)(4)(A) *with* 8 U.S.C. § 1324b(g)(2)(B)(iv). Also, criminal penalties are available for certain pattern-or-practice violations under § 1324a, but not available under § 1324b. *See* 8 U.S.C. § 1324a(f)(1). In contrast, § 1324b provides for compensatory relief, such as backpay and other remedies, which is not available under § 1324a. *See* 8 U.S.C. § 1324b(g)(2)(B)(iii) and (vii)-(viii).

**3. The Illegal Immigration Reform and Immigrant Responsibility Act**

In 1996, Congress again amended the INA by enacting the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009 (codified as amended in various sections of 8 U.S.C.). In IIRIRA, Congress directed the Attorney General, and later the Secretary of Homeland Security, to conduct three "pilot programs of employment eligibility confirmation" in an attempt to improve upon the I-9 process. IIRIRA § 401(a), 110 Stat. 3009-655. Congress mandated that these programs be conducted on a trial basis, for a limited time period, and in a limited number of states. *See* IIRIRA § 401(b)-(c), 110 Stat. 3009-655-66. Two of these trial systems were discontinued in 2003. However, the third – originally known as the "Basic Pilot Program" but since renamed "E-Verify" – was reauthorized and expanded to all fifty states in 2003. *See* Basic Pilot Program Extension and Expansion Act of 2003, Pub. L. No. 108-156, §§ 2, 3, 117 Stat. 1944. It has been reauthorized several times since, and its current authorization will expire, absent congressional action, on September 30, 2012. *See* Department of Homeland Security

Appropriations Act, 2010, Pub. L. No. 111-83, § 547, 123 Stat. 2177; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, Div. A, § 143, 122 Stat. 3580.

E-Verify allows an employer to actually authenticate applicable documents rather than merely visually scan them for genuineness. When using E-Verify, an employer enters information from an employee's documents into an internet-based computer program, and that information is then transmitted to the Social Security Administration and/or DHS for authentication. *See* IIRIRA, as amended, § 403(a)(3). These agencies confirm or tentatively nonconfirm whether the employee's documents are authentic, and whether the employee is authorized to work in the United States. *See* IIRIRA, as amended, § 403(a)(4). If a tentative nonconfirmation is issued, the employer must notify the employee, who may contest the result. *See id.* If an employee does not contest the tentative result within the statutorily prescribed period, the tentative nonconfirmation becomes a final nonconfirmation. *See id.* If the employee does contest it, the appropriate agencies undertake additional review and ultimately issue a final decision. *See id.*

An employer may not take any adverse action against an employee until it receives a final nonconfirmation. *See id.* However, once a final nonconfirmation is received, an employer is expected to terminate the employee, or face sanctions.

With only a few exceptions, federal law makes the decision of whether to use E-Verify rather than the default I-9 process entirely voluntary. *See* IIRIRA, as amended, § 402(a). Federal government employers and certain employers previously found guilty of violating IRCA are currently required to use E-Verify; all other employers remain free to use the system of their choice.[23] *See* IIRIRA, as amended, § 402(e). Significantly, in enacting IIRIRA, Congress specifically prohibited the Secretary of Homeland Security from requiring "any person or other entity to participate in [E-Verify]." *See* IIRIRA, as amended, § 402(a). Congress also directed the Secretary to publicize the "voluntary nature" of the program and to ensure that government representatives are available to "inform persons and other entities that seek information about [E-Verify] of [its] voluntary

---

[23] Pursuant to an executive order by President George W. Bush, certain federal government contractors are now also required to use E-Verify. *See* Exec. Order No. 13,465, 73 Fed. Reg. 33,286 (Jun. 6, 2008).

nature."  IIRIRA, as amended, § 402(d).

Those employers who elect to use E-Verify and actually do use the system to confirm an employee's authorization to work are entitled to a rebuttable presumption that they did not hire that employee knowing that s/he lacks authorization to work in this country.  *See* IIRIRA, as amended, § 402(b)(1).  Employers who elect to use E-Verify, but in practice continue to use the I-9 process, are not entitled to the E-Verify rebuttable presumption, but can still claim the I-9 affirmative defense.  *See* IIRIRA, as amended, § 402(b)(2).

**B.  State and Local Immigration Laws**

As we noted at the outset, state and local attempts to regulate issues related to immigration have skyrocketed in recent years.  According to the National Conference of State Legislatures ("NCSL"), 300 bills pertaining to immigration were introduced in state legislatures in 2005, and thirty-eight of them were enacted into law.  National Conference on State Legislatures, *2009 State Laws Related to Immigrants and Immigration January 1-December 31, 2009*, http://www.ncsl.org/default.aspx?tabid=19232 (last visited Aug. 20, 2010).  Less than five years later, these numbers had

increased more than five-fold: in 2009, over 1,500 bills pertaining to immigration were introduced. From these, 222 laws were enacted, and 131 resolutions adopted. *Id.*

A number of these laws contain provisions that are either identical, or similar, to provisions in Hazleton's ordinances.[24] In their brief filed on behalf of Plaintiffs, *Amici Curiae* Chambers of Commerce note that Arizona, Mississippi, Oklahoma, Utah, Tennessee, Louisiana, West Virginia, Colorado, Minnesota, Georgia, and Rhode Island, as well as the municipalities of Valley Park, Missouri; Mission Viejo, California; Beaufort County, South Carolina; and Apple Valley, California, have all enacted laws that in some way regulate either the procedures employers must undertake in order to avoid hiring unauthorized aliens, or the penalties that can be imposed for doing so. In addition, Plaintiffs call our attention to several localities, including Escondido, California and the City of Farmers Branch, Texas, which have passed ordinances regulating the provision of rental housing to aliens not lawfully present in the United States.

---

[24] In fact, Hazleton's mayor got the idea of enacting the IIRAO and the RO from similar ordinances, considered but never passed, in San Bernardino, California. *See* J.A. 1385-87.

Various challenges have been leveled at these enactments – most commonly, attacks rooted in the Supremacy Clause – and the resulting body of case law informs our analysis. The Court of Appeals for the Ninth Circuit, affirming a decision by the District Court for the District of Arizona, upheld an Arizona statute requiring all employers within the state to use E-Verify, and subjecting businesses that employ unauthorized aliens to a graduated series of sanctions up to and including the permanent revocation of their business licenses. That court rejected the plaintiffs' pre-emption and due process claims. *See Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856 (9th Cir. 2009), *cert. granted*, 78 U.S.L.W. 3065 (Jun. 28, 2010) (No. 09-115). The District Court for the Eastern District of Missouri also upheld an employment ordinance virtually identical to the IIRAO against pre-emption, due process, and equal protection challenges, as well as challenges based on state law. *See Gray v. City of Valley Park*, No. 4:07CV00881, 2008 WL 294294 (E.D. Mo. Jan. 31, 2008), *aff'd on other grounds*, 567 F.3d 976 (8th Cir. 2009).

In contrast, the Court of Appeals for the Tenth Circuit partially affirmed a preliminary injunction issued by the District

Court for the Western District of Oklahoma, barring enforcement of certain provisions of an Oklahoma law on pre-emption grounds. Much like the IIRAO, that law required employers in Oklahoma to verify the work authorization of independent contractors, and also created a private cause of action against business entities that employ unauthorized aliens. *See Chamber of Commerce v. Edmondson*, 594 F.3d 742 (10th Cir. 2010).

The District Courts for the Southern District of California and the Northern District of Texas have held that ordinances similar to the housing provisions of the IIRAO and the RO are pre-empted. *See Villas at Parkside Partners v. City of Farmers Branch ("Farmers Branch III")*, ___ F. Supp. 2d ___, Nos. 3:08-cv-1551-B, 3:03-cv-1615, 2010 WL 1141398 (N.D. Tex. Mar. 24, 2010); *Villas at Parkside Partners v. City of Farmers Branch ("Farmers Branch II")*, 577 F. Supp. 2d 858 (N.D. Tex. 2008); *Garrett v. City of Escondido*, 465 F. Supp. 2d 1043 (S.D. Cal. 2006).

## C. Pre-emption

As we have explained, the district court entered the challenged injunction because it concluded that the IIRAO and

the RO, among other failings, are pre-empted by federal law. Although our reasoning departs from that of the district court, we agree with its conclusion.[25] *See Johnson v Orr*, 776 F.2d 75, 83 n.7 (3d Cir. 1985) ("An appellate court may affirm a result reached by the district court on reasons that differ so long as the record supports the judgment.").

The Supremacy Clause of the United States Constitution provides that the laws of the United States "shall be the supreme

_____

[25] Plaintiffs present a facial challenge to these ordinances. In *Washington State Grange v. Washington State Republican Party,* the Supreme Court explained:

> Under *United States v. Salerno*, 481 U.S. 739 (1987), a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid," *i.e.* that the law is unconstitutional in all of its applications. *Id.* at 745. While some Members of the Court have criticized the *Salerno* formulation, all agree that a facial challenge must fail where the statute has a "plainly legitimate sweep." *Washington v. Glucksberg*, 521 U.S. 702, 739-40 and n.7 (1997).

552 U.S. 442, 449 (2008) (alteration in original). Based on this language, Hazleton insists that we must apply the *Salerno* standard to Plaintiffs' claims under the Supremacy Clause. However, since both *Washington State Grange* and *Salerno* involved quite different constitutional challenges than the ones we consider here, it is not at all clear that *Salerno* applies. Nonetheless, it is clear that solely "hypothetical conflicts" between state and local enactments and federal law are usually insufficient to support a finding of pre-emption. *See Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 310 (1988).

Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The pre-emption doctrine is a necessary outgrowth of the Supremacy Clause. It ensures that when Congress either expresses or implies an intent to preclude certain state or local legislation, offending enactments cannot stand.

As this Court has recently noted, "the Supreme Court has recognized three types of preemption: express preemption, implied conflict preemption, and field preemption." *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 238-239 (3d Cir. 2009) (citing *Hillsborough County, Fla., v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713(1985). Both conflict pre-emption and field pre-emption are types of implied pre-emption. *See, e.g., Hillsborough Cnty. v. Automated Med. Labs, Inc.*, 471 U.S. 707, 713 (1985). However, irrespective of the "type" of pre-emption involved, "the purpose of Congress" is the "touchstone" of any pre-emption inquiry. *Wyeth v. Levine*, 129 S.Ct. 1187, 1194 (2009) (internal quotation marks omitted).

However, it is important to note that Congress does not "cavalierly" pre-empt states or municipalities from acting within the parameters of their historic police powers. *Medtronic, Inc.*

*v. Lohr*, 518 U.S. 470, 485 (1996). Accordingly, in pre-emption inquiries, we assume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (internal quotation marks omitted). When states act beyond the scope of their historic police powers, however, and wander into "an area where there has been a history of significant federal presence," we do not begin with this assumption of nonpre-emption. *United States v. Locke*, 529 U.S. 89, 108 (2000).

Express pre-emption occurs when Congress expressly declares a law's pre-emptive effect. *See Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001). In such cases, "our task is to identify the domain expressly pre-empted." *Id.* In doing so, we focus in the first instance "on the plain wording of the [federal statute's pre-emption] clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63 (2002) (internal quotation marks omitted). We also consider the "structure and purpose of the statute as a whole . . . as revealed not only in the text, but through [our] reasoned understanding of the way in which Congress intended the statute and its

87

surrounding regulatory scheme to [operate]." *Medtronic,* 518 U.S. at 486 (internal quotation marks and citation omitted).

Implied field pre-emption occurs when state or local governments attempt regulation in a field which Congress has implied an intent to exclusively occupy. *See English v. Gen. Electric Co.*, 496 U.S. 72, 79 (1990). Congress's intent to occupy a field can be inferred where a federal regulatory scheme is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (internal quotation marks omitted), or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947).

Implied conflict pre-emption occurs where it is "impossible . . . to comply with both state and federal law," *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 873 (2000) (internal quotation marks omitted), or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312

U.S. 52, 67 (1941). "Impossibility" conflict pre-emption exists only where it is truly impossible to comply with both federal and state law. "Obstacle" conflict pre-emption, on the other hand, requires a broader inquiry into the purposes underlying a federal statute, and whether a state law stands as an obstacle to effectuation of those purposes. "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

The Supreme Court has long made clear that federal interests are paramount in the field of immigration. The Court explained seventy years ago: "[t]hat the supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution was pointed out by authors of The Federalist in 1787, and has since been given continuous recognition by this Court." *Hines*, 312 U.S. at 62; *see also Toll v. Moreno*, 458 U.S. 1, 10 (1982).

However, the Supreme Court has also explained that not every state or local enactment that affects the rights of aliens

89

necessarily interferes with the federal interest in immigration. In *DeCanas v. Bica*, 424 U.S. 351 (1976), the Supreme Court articulated a framework for analyzing pre-emption challenges to state and local laws that impact the rights of aliens but do not "regulate immigration." Although *DeCanas* was decided a decade before Congress enacted IRCA and two decades before it enacted IIRIRA, many aspects of the Court's analysis are still relevant to our inquiry.

In *DeCanas*, the Supreme Court considered whether a state law prohibiting the employment of persons unlawfully present was pre-empted by the INA. California had enacted legislation prohibiting employers within the state from "knowingly employ[ing] an alien who is not entitled to lawful residence in the United States if such employment would have an adverse effect on lawful resident workers." *Id*. at 352 (internal quotation marks omitted). A group of migrant farmworkers sued, arguing that the law was pre-empted both by the Constitution's exclusive delegation of the power to regulate immigration to the federal government, and by the INA. The Court disagreed.

In upholding the statute, the Court explained that the

"[p]ower to regulate immigration is unquestionably exclusively a federal power" under the United States Constitution, precluding all state involvement even if Congress has neither expressed nor implied its intent to preclude that state regulation. *Id.* at 354. "[T]he Constitution of its own force requires pre-emption" of any state efforts to actually regulate immigration. *Id.* at 355. However, the Court also explained that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power." *Id.* Rather, a state law only regulates immigration if it is "essentially a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.* As California's law did not intrude into these proscribed areas, the Court held that it was not pre-empted, absent congressional action.

The Court also held that California's law was not field pre-empted by the INA's regulatory scheme. First, the Court explained that "the regulation of employment of illegal aliens" was not a subject matter of such clear and manifest federal importance as to require the conclusion that it was occupied by federal regulation. *Id.* at 356. The Court reasoned that states

have "broad authority under their police powers to regulate the employment relationship to protect workers within the State," and that California's law fell "within the mainstream of such police power regulation." *Id.* Because the law "focuse[d] directly upon the[] essentially local problems [of employing illegal aliens] and [was] tailored to combat effectively the perceived evils," it did not touch upon a field that by its very nature would support no conclusion but that Congress had occupied it.[26] *Id.* at 357.

Secondly, the Court concluded that the INA as it then existed did not reflect clear and manifest congressional intent to preclude state regulation in the field of employment of aliens here unlawfully. Then, the INA was primarily concerned with "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Id.* at 359. Only one provision of one section of the INA even

---

[26] In reaching this conclusion, the Court distinguished cases in which pre-emption was found based on the "predominance of federal interest in the fields of immigration and foreign affairs." *DeCanas*, 424 U.S. at 363. It explained that "there would not appear to be a similar federal interest in a situation in which the state law is fashioned to remedy local problems, and operates only on local employers, and only with respect to individuals whom the Federal Government has already declared cannot work in this country." *Id.*

mentioned the employment of persons not lawfully in the country.[27] This evidenced "at best . . . a peripheral concern with employment of illegal entrants," which was insufficient to establish a congressional intent to occupy the field. *Id.* at 360. To the contrary, the Court believed that Congress had indicated its intent, through laws addressing farm labor contractors, for the States to "consistent with federal law, regulate the employment of illegal aliens." *Id.* at 361.

The Court did not, however, actually rule on the issue of conflict pre-emption. Rather, it remanded the matter so that the lower courts could determine if California's law was "consistent with federal law." *Id.* In all other respects, though, the Court found the challenged law an appropriate use of state power, given both its limited impact upon "immigration" and Congress's then limited foray into regulating the employment of persons lacking lawful immigration status.

In sum, *DeCanas* holds that the federal authority to "regulate immigration" is exclusive, but states are not

_____

[27] That provision was contained in 8 U.S.C. § 1324, the section which makes it a felony to "harbor" illegal entrants, and it stated that employing aliens here unlawfully "shall *not* be deemed to constitute harboring." *DeCanas*, 424 U.S. at 360 (internal quotation marks omitted) (emphasis added).

necessarily precluded from regulating (consistent with federal law) certain local issues affecting the rights of aliens, unless Congress has indicated an intent to preclude such regulation.

## 1. Employment Provisions

## a. Presumption Against Pre-emption

The district court concluded that the employment provisions of the IIRAO were expressly pre-empted, field pre-empted, and conflict pre-empted. Hazleton challenges each of the district court's conclusions on multiple grounds. Hazleton first claims that the district court erred in failing to apply the presumption against pre-emption. We agree.

As we have noted, Congress does not casually sweep away the historic police powers of states. This reality underlies the rebuttable presumption that federal legislation does not pre-empt those police powers absent "clear and manifest" congressional intent to the contrary. *Medtronic*, 518 U.S. at 485. Only state and local laws aimed at areas beyond the state's historic police powers, that venture into matters long regulated by the federal government, are not afforded the benefit of this presumption. *See Locke*, 529 U.S. at 108 ("[A]n assumption of nonpre-emption is not triggered when the State regulates in an

94

area where there has been a history of significant federal presence.") (internal quotation marks omitted).

In analyzing the applicability of the presumption in this case, the district court reasoned that "[i]mmigration is an area of the law where there is a history of significant federal presence and where the States have not traditionally occupied the field. In fact . . . immigration is a federal concern not a state or local matter." *Lozano*, 496 F. Supp. 2d at 518 n.41. Based on this reasoning, the district court refused to presume nonpre-emption. However, the district court's analysis is inconsistent with the framework set forth in *DeCanas*.

As we noted above, in *DeCanas* the Supreme Court explained that not "every state enactment which in any way deals with aliens is a regulation of *immigration*." 424 U.S. at 355 (emphasis added). Rather, laws regulate immigration only if they attempt to regulate "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *Id.* Hazleton's employment provisions therefore plainly do not regulate immigration under *DeCanas*. Rather, they regulate the employment of persons unauthorized to work in this country, and like the law at issue in

95

*DeCanas*, fall within the state's historic police powers. Accordingly, they must benefit from the presumption against pre-emption.

We are aware, of course, that the landscape of federal immigration law has changed dramatically since the Court decided *DeCanas*. In enacting IRCA, Congress clearly made the regulation of the employment of unauthorized aliens a central concern of federal immigration policy. However, while this sea change in the federal regulatory scheme is incredibly important for purposes of our substantive analysis, it does not negate the operation of the presumption against pre-emption. The applicability of the presumption turns on a state's *historic* police powers. By definition, that means that the presumption depends on the *past* balance of state and federal regulation, not on the present.

As we have just explained, until the passage of IRCA, the federal government played at most a very small role in regulating the employment of persons without lawful immigration status. *See DeCanas*, 424 U.S. at 360. Moreover, the Supreme Court concluded that Congress then intended for the states to, "consistent with federal law, regulate the

96

employment of illegal aliens." *Id.* at 361. Thus, when Congress enacted IRCA, it began legislating in an area in which states had regulated, and in which the federal government, for the most part, had not. Accordingly, we presume that Congress did not intend to sweep away the states' historic police powers by enacting IRCA, absent clear evidence to the contrary.

**b. Express Pre-emption**

As noted above, IRCA includes an express pre-emption clause, which states that: "[t]he provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2). Thus, IRCA expressly pre-empts state and local laws that sanction those who employ unauthorized aliens, unless the sanction is imposed through a licensing, or similar, law.

The district court read this clause as expressly pre-empting Hazleton's employment provisions in the IIRAO because they impose a sanction – the suspension of a business license – on business entities that employ unauthorized aliens. Hazleton had argued that the IIRAO is a licensing law, and thus

97

saved from the express pre-emptive reach of IRCA, but the district court disagreed. The court reasoned that since the IIRAO imposes the "ultimate sanction" of entirely taking away a business's ability to operate, it is "at odds with the plain language of the express pre-emption provision, which is concerned with state and local municipalities creating civil and criminal sanctions against employers."[28] *Lozano*, 496 F. Supp. 2d at 519.

The district court also concluded, based on a review of IRCA's legislative history, that the IIRAO's scheme for revoking licenses is inconsistent with the congressional intent underlying IRCA's saving clause. According to the court, Congress had no intention, in exempting licensing laws from express pre-emption, of permitting states and localities to independently adjudicate whether a business entity has employed an unauthorized alien. In reaching this conclusion, the district court reviewed H.R. Rep. No. 99-682(I), reprinted in 1986 U.S.C.C.A.N. 5649, the sole piece of IRCA's legislative history directly discussing the pre-emption provision. Based on

---

[28] In effect, then, the district court believed that a business license was not the species of "license" Congress had in mind in exempting licensing laws from express pre-emption.

several sentences in that Report, the court concluded that Congress intended the saving clause to only exempt from express pre-emption local laws that revoke the licenses of persons who *the federal government has found guilty of violating IRCA*, and not the licenses of persons who localities independently adjudicate guilty of violating their own prohibitions against employing unauthorized aliens.[29] Because the IIRAO creates its own procedures for adjudicating whether an employer is guilty of employing unauthorized aliens, and revokes licenses based on that determination, rather than based on a federal determination that an employer has violated IRCA,

---

[29] The House Report states:

> [t]he penalties contained in this legislation are intended to specifically preempt any state or local laws providing civil fines and/or criminal sanctions on the hiring, recruitment or referral or undocumented aliens. They are not intended to preempt or prevent lawful state or local processes concerning the suspension, revocation or refusal to reissue a license to any person *who has been found to have violated the sanctions provisions in this legislation*. Further, the Committee does not intend to preempt licensing or "fitness to do business laws," such as state farm labor contractor laws or forestry laws, which specifically require such licensee or contractor to refrain from hiring, recruiting or referring undocumented aliens.

H.R. Rep. No. 99-682(I), at 12 (emphasis added).

the court concluded that the IIRAO's employment provisions do not fall within the scope of IRCA's saving clause. *See Lozano*, 496 F. Supp. 2d at 520. On appeal, Hazleton renews its argument that the IIRAO's employment provisions are a "licensing" law within the meaning of IRCA's saving clause, and we agree.

As noted earlier, the text of IRCA's express pre-emption clause explicitly excludes from its pre-emptive scope "licensing and similar laws." Congress did not define these terms. Terms that are not statutorily defined are usually ascribed their "ordinary or natural meaning." *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 476 (1994).

Merriam-Webster's Dictionary defines a license as "a permission granted by competent authority to engage in a business or occupation or in an activity otherwise unlawful."[30] Similarly, Black's Law Dictionary defines a license as "a permission, usually revocable, to commit some act that would otherwise be unlawful." *Black's Law Dictionary* (8th ed. 2004). Here, the IIRAO conditions the grant of a business license on a

---

[30] License Definition, Merriam-Webster.com, http://www.merriam-webster.com/dictionary/license (last visited Aug. 17, 2010).

business's agreement not to employ unauthorized aliens, and on the business's continued adherence to that agreement. A business license certainly falls within the plain meaning of a "license" and therefore, it seems clear that the IIRAO's provisions for suspending such licenses constitute a "licensing law."

Plaintiffs nonetheless argue, consistent with the district court's decision, that IRCA's express pre-emption provision would be toothless if a state or municipality could effectively circumvent the general prohibition on imposing sanctions by imposing sanctions of this severity. According to Plaintiffs, the loss of a business license is the "death penalty" for a business, and the express pre-emption clause would be swallowed by its exception if a law regulating business licenses is held to be a licensing law.

In support of their argument, Plaintiffs cite several recent Supreme Court cases which stand for the proposition that courts should read saving clauses narrowly, and in light of the statutory scheme as a whole. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 217 (2004); *Geier*, 529 U.S. at 870-71; *Locke*, 529 U.S. at 106. Looking at IRCA and its purposes more broadly, Plaintiffs

101

argue that it is clear that Congress could not have intended the saving clause to permit states and localities to revoke the business licenses of employers who employ unauthorized aliens.

The problem with Plaintiffs' argument, however, is that even if we look more broadly at IRCA as a whole, there is simply no basis for wedging the limitation Plaintiffs urge into the text. Congress unequivocally states in the saving clause that licensing laws are not expressly pre-empted by IRCA. Nowhere in IRCA's text or legislative history is there an indication that Congress intended that clause to apply only to licensing laws that impose minor penalties, and not to licensing laws that impose more significant sanctions. Similarly, there is no indication that Congress intended to exclude laws regulating the provision, suspension, and revocation of business licenses from the term "licensing law," and Plaintiffs do not offer an alternative definition of "license" that would sensibly exclude business licenses. *See Chicanos Por La Causa*, 558 F.3d at 865 (finding "no support for [plaintiffs'] interpretation" of the term "license" as excluding business licenses).

When statutory language is plain and unambiguous, "the sole function of the courts . . . is to enforce it according to its

terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004)

(internal quotation marks omitted). We therefore conclude that

the IIRAO is a licensing law under IRCA's saving clause and

saved from express pre-emption.[31]

---

[31] Plaintiffs also argue that the IIRAO is not a bona fide licensing law. They note that the IIRAO's title and its "Findings and Declaration of Purpose" section make no reference to licensing, and that the IIRAO does not refer to any existing licensing provisions. Thus, rather than being a true licensing law directed towards any legitimate local concerns, Plaintiffs claim that the IIRAO should be viewed as part of a scheme intended to regulate immigration by keeping all persons lacking lawful immigration status out of the City, and by supplanting the federal government's role in these matters. The argument has significant force, and is very troubling.

This record is not without support for the proposition that, in enacting both the IIRAO and the RO, the Hazleton City Council was trying to use every tool at its disposal not merely to address local concerns with a "purely speculative and indirect impact on immigration," *DeCanas*, 424 U.S. at 355, but to alter to the best of its ability the landscape of federal immigration regulation as well. *See, e.g.*, J.A. 1289 (testimony of the President of Hazleton's City Council that he intended Hazleton's ordinances to force the federal government into action); J.A. 1713 (testimony of Hazleton's mayor that the IIRAO is intended "to deter and punish illegal immigrants"). Furthermore, it appears that these ordinances were enacted as part of an organized campaign of certain states and localities attempting to collectively remedy what they view as the federal government's failure to "secure our borders." *See, e.g.*, J.A. 1438 (testimony of Hazleton's mayor that he has encouraged communities across the country to enact similar ordinances).

Although the Supreme Court has never directly addressed how the intent behind a local enactment should factor into a pre-emption analysis under these circumstances, we do not think the Hazleton City Council's intent is irrelevant. *See Plyler*, 457 U.S. at 207 (noting the district court's determination that the law at issue had neither "the purpose [n]or effect of keeping illegal aliens out of the State of Texas") (internal quotation marks omitted); *DeCanas*, 424 U.S. at 354 n.3 (noting disagreement among the

(continued...)

Plaintiffs also argue (consistent with the district court's decision) that the IIRAO does not fall within IRCA's saving clause because it creates and relies upon its own adjudicative system for determining whether an employer has employed an unauthorized alien, rather than relying, as Congress intended, on the adjudicative system created by IRCA. Because this argument is better addressed in the context of the purposes and objectives underlying IRCA, we attend to it in our discussion of obstacle conflict pre-emption.[32]

---

[31](...continued)
California state courts as to whether California's law was "aimed at immigration control") (internal quotation marks omitted). However, we also realize that the Supreme Court has explained that states are not "without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernable impact on traditional state concerns." *Plyler*, 457 U.S. at 229 n.23.

The Supreme Court will undoubtedly speak to this tension soon, given the number of states and localities attempting to chip away piece-meal at the federal power to regulate immigration. Fortunately, we need not wade into these murky waters in order to resolve the claims before us. As we will explain, the employment provisions are plainly pre-empted, regardless of the intent behind them, because they pose an obstacle to the careful balancing of interests underlying IRCA.

[32] The district court also concluded that the IIRAO's employment provisions are pre-empted because IRCA occupies the field of "the employment of unauthorized aliens." *Lozano*, 496 F. Supp. 2d at 524. This is a broad field indeed, and a difficult conclusion to sustain given IRCA's saving clause. *See Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987) (The existence of a saving clause "negates the inference that Congress 'left no room'

(continued...)

### c. Conflict Pre-emption

That the IIRAO's employment provisions are saved from express pre-emption does not end our inquiry. As the Supreme Court has emphasized, a law that is saved from express pre-emption is still invalid if it is conflict pre-empted. *See Geier*, 529 U.S. at 870-72. The fact that Congress intends to *save* a general class of laws, such as licensing and similar laws, from express pre-preemption does not mean that Congress intends to *permit* any law within that category even if it impedes federal interests. A federal law that forecloses conflict pre-emption analysis is one that "defeat[s] its own objectives." *Id.* at 872. Congress may intend "such a complex type of state/federal relationship," but we will not assume it absent proof. *Id.* Therefore, even though the IIRAO is a licensing law, it cannot be allowed to operate if compliance with both its employment provisions and IRCA is impossible, or if those provisions stand as an obstacle to the objectives underlying IRCA. In either case,

---

[32](...continued)
for state causes of action."). Plaintiffs, however, press the argument of field pre-emption only in a footnote, and we therefore consider it waived. *See John Wyeth & Bro., Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (noting, ironically enough in a footnote, that "arguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived").

the Supremacy Clause requires that the IIRAO give way.

The district court concluded that the IIRAO's employment provisions are pre-empted by IRCA because of the numerous ways in which they "differ from and conflict with IRCA." *Lozano*, 496 F. Supp. 2d at 529. Hazleton argues that the district court erred by conflating "mere difference" with conflicts sufficient to result in pre-emption. Hazleton's Br. 46.

The City correctly argues that conflict pre-emption occurs only if a "difference" either makes it impossible to comply with both federal and local law or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines*, 312 U.S. at 67; *see also Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141 (1963). We too have concerns about the district court's approach, both because it did at times equate difference with conflict, and because it failed to anchor its articulation of the congressional purposes underlying IRCA to that statute's language and legislative history.

Nonetheless, upon a thorough consideration of those purposes, we agree that the IIRAO's employment provisions stand as an obstacle to the accomplishment and execution of

106

federal law, and thus are pre-empted.

As we will explain, it is indisputable that Congress went to considerable lengths in enacting IRCA to achieve a careful balance among its competing policy objectives of effectively deterring employment of unauthorized aliens, minimizing the resulting burden on employers, and protecting authorized aliens and citizens perceived as "foreign" from discrimination. *See Edmondson*, 594 F.3d at 767 (IRCA balances the goals of "preventing the hiring of unauthorized aliens, lessening the disruption of American business, and minimizing the possibility of employment discrimination."). The IIRAO substantially undermines this careful balance. It furthers the first of these federal objectives at the expense of the others. This "significant conflict" is sufficient to rebut the presumption against pre-emption, *see Geier*, 529 U.S. at 885, and invalidate these provisions under the Supremacy Clause.

IRCA was "one of the longest and most difficult legislative undertakings of recent memory." Presidential Statement on Signing the Immigration Reform and Control Act, 22 Weekly Comp. Pres. Doc. 1534 (Nov. 10, 1986). Over the course of numerous sessions, Congress debated taking the

theretofore unprecedented step of directly prohibiting the employment of "unauthorized aliens."[33]  Congress ultimately committed to enacting employer sanctions, but in so doing, committed equally to enacting measures that would protect groups likely to be unfairly burdened by those sanctions – employers and authorized workers.  IRCA is thus "a carefully crafted political compromise which at every level balances specifically chosen measures discouraging illegal employment with measures to protect those who might be adversely affected."  *Nat'l Ctr. for Immigrants' Rights, Inc. v. INS,* 913 F.2d 1350, 1366 (9th Cir. 1990), *rev'd on other grounds*, 502 U.S. 183 (1991).

Congress paid considerable attention to the costs IRCA would impose on employers, *see, e.g.*, H.R. Rep. No. 99-682(I), at 43 ("Considerable discussion was generated during the processing of [this bill] to the effect the employer sanctions

---

[33] At the time of IRCA's passage, there was still significant opposition to requiring employers to play a role in enforcing the nation's immigration policy.  *See, e.g.*, 132 Cong. Rec. H10583-01 (daily ed. Oct. 15, 1986) (statement of Rep. Martinez) ("For the first time in history, this bill institutes Federal penalties for private citizens who hire illegal aliens. . . . [We should] put the burden of enforcing the law on the Government, where it belongs, not on private employers.  Not only is this unfair to private employers, but it will cause them, out of fear, to discriminate against prospective employees who are 'foreign-looking.'").

provisions were placing an undue burden on employers in requiring them to do the paperwork and keep records on employees."), and drafted the legislation in a manner that would minimize those burdens, *see, e.g.*, 132 Cong. Rec. H10583-01 (daily ed. Oct. 15, 1986) (statement of Rep. Bryant) (IRCA has been "carefully designed for the minimum burden necessary . . . to be effective.").

Congress heeded these concerns in crafting IRCA's prosecution and adjudication scheme. For example, it limited investigation of complaints to those with a "substantial probability of validity" in order to minimize the possibility of "harassment" of "innocent employers." 8 U.S.C. § 1324a(e)(1)(B); S. Rep. No. 99-132, at 35 (1985). Similarly, Congress "intended to minimize the burden and the risk placed on the employer in the verification process." *Collins Foods Int'l, Inc. v. INS*, 948 F.2d 549, 554 (9th Cir. 1991). Accordingly, the I-9 process only requires employers to ascertain whether employees' documents appear "on [their] face to be genuine." 8 U.S.C. § 1324a(b)(1)(A)(ii); H.R. Rep. No. 99-682(I), at 16. Congress could have required employers to ascertain the actual legitimacy of such documents; it did not.

109

Just as importantly, Congress strove to ensure that the prohibition against hiring unauthorized aliens would not result in discrimination against authorized workers (whether alien or citizen) who appear "foreign," as Congress feared that overcautious employers might incorrectly assume such persons were unauthorized to work in the United States. IRCA's legislative history could not be more plain or emphatic about the congressional commitment to preventing this sort of discrimination. The House Report explains:

> Numerous witnesses over the past three Congresses have expressed their deep concern that the imposition of employer sanctions will cause extensive employment discrimination against Hispanic-Americans and other minority group members. . . . [T]he Committee does believe that every effort must be taken to minimize the potentiality of discrimination and that a mechanism to remedy any discrimination that does occur *must* be a part of this legislation. . . . *[A]nti-discrimination protections are essential to this bill.*

H.R. Rep. No. 99-682(I), at 22 (internal quotation marks omitted) (emphasis added). IRCA is thus "delicately balanced to serve the goal of preventing unauthorized alien employment while avoiding discrimination against citizens and authorized aliens." *Collins Foods Int'l*, 948 F.2d at 554. As we explained

110

earlier, Congress created the office of a Special Counsel to handle discrimination charges, *see* 8 U.S.C. § 1324b(c), and specifically required that the President fill that position, *see* 8 U.S.C. § 1324b(c)(1). As also detailed above, Congress authorized administrative law judges to impose on employers found guilty of discrimination civil penalties equivalent to the penalties imposed on employers found guilty of employing unauthorized aliens. *See* 8 U.S.C. § 1324b(g)(2)(B)(iv)(I)-(III).

The Supreme Court has consistently found state and local laws which alter the careful balancing of objectives accomplished by a federal law to be pre-empted, and so have we. *See, e.g.*, *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 144 (1989) (finding Florida law pre-empted because it struck the balance between "the encouragement of invention and free competition in unpatented ideas" differently from federal patent law); *Rogers v. Larson*, 563 F.2d 617, 626 (3d Cir. 1977) (finding Virgin Islands law pre-empted because it struck the balance between "assur[ing] an adequate labor force on the one hand and . . . protect[ing] the jobs of citizens on the other" differently from federal immigration law). Hazleton's IIRAO undermines IRCA's careful balancing of objectives in at

111

least four ways.

First, the IIRAO significantly increases employer burden by creating a separate and independent adjudicative system for determining whether an employer is guilty of employing unauthorized aliens. Hazleton's system fails to reflect the same concern with reducing employer burden as IRCA. In contrast to the federal requirement that a complaint have a "substantial probability of validity," the IIRAO permits investigation of any complaint lodged against an employer regardless of its likely merit. Under Section 4 of the IIRAO, a complaint is valid so long as it includes an "allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred." IIRAO § 4B. Upon receipt of *any* such complaint (so long as it does allege a violation on the basis of national origin, ethnicity, or race), Hazleton's Code Enforcement Office must, "within three business days, request identity information from the business entity regarding any persons alleged to be unlawful workers." IIRAO § 4B(2)-(3).

Similarly, the IIRAO provides employers with substantially fewer procedural protections than IRCA. Under

112

IRCA, an employer must be provided with notice and an opportunity for a hearing, and an administrative law judge must find the employer guilty of violating IRCA by a preponderance of the evidence *before* any sanctions can be imposed. *See* 8 U.S.C. § 1324a(e). That employer also has a right to an administrative appeal and judicial review. *See id.* In marked contrast, the IIRAO requires Hazleton's Code Enforcement Office to immediately suspend the business license of a business entity which fails to provide requested information about alleged unlawful workers within three business days. *See* IIRAO § 4B(3). Additionally, if a business entity fails to terminate anyone that Hazleton has decided is an unlawful worker within three business days, the Code Enforcement Office immediately suspends its license. *See* IIRAO § 4B(4). A business entity that has been "subject to a complaint and subsequent enforcement" can then seek relief in court, but both the procedure and remedies available to that employer are entirely unclear on the face of the ordinance. *See* IIRAO § 7F.

The crux of this conflict, however, transcends the differences between the IIRAO's prosecution and adjudication system and IRCA's. Rather, it is rooted in the fact that Hazleton

113

has established an alternate system *at all*. As we have explained, Congress created a comprehensive and carefully balanced prosecution and adjudication system, and foremost among its goals in doing so was to minimize the burden this system would impose on employers. *See Edmondson*, 594 F.3d at 751 (IRCA "exhaustively details a specialized administrative scheme for determining whether an employer has knowingly employed an unauthorized alien."). We therefore cannot fathom that Congress intended to tolerate the "supplementing" of its carefully crafted system with independent state and local systems, which by their mere existence drastically increase burdens on employers.

Under the IIRAO, a business in Hazleton must worry about two separate systems of complaints, investigations, prosecutions, and adjudications. Furthermore, Hazleton's ordinance is not the only consideration here, given the emerging landscape of local and state regulation in the area. *See, e.g.*, *Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 350 (2001) (explaining that if one state's tort system is permitted then federal law will have to operate "in the shadow of 50 States' tort regimes [thereby] dramatically increas[ing] the burdens facing

114

potential applicants – burdens not contemplated by Congress").

If Hazleton's ordinance is permissible, then each and every state and locality would be free to implement similar schemes for investigating, prosecuting, and adjudicating whether an employer has employed unauthorized aliens. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 373 (2008) (reasoning that allowing one state to implement its own monitoring system "would allow other States to do the same . . . easily lead[ing] to a patchwork of state . . . laws, rules, and regulations"). As noted above, many states and localities have already tried. A patchwork of state and local systems each independently monitoring, investigating, and ultimately deciding – all concurrently with the federal government – whether employers have hired unauthorized aliens could not possibly be in greater conflict with Congress's intent for its carefully crafted prosecution and adjudication system to minimize the burden imposed on employers.[34]

_____

[34]Although we have been framing this question as one of conflict pre-emption, Hazelton's actions may be subject to field pre-emption as well. "Field preemption arises by implication when state law occupies a 'field reserved for federal regulation.' *Bruesewitz*, 561 F.3d at 238 (*citing United States v. Locke*, 529 U.S. 89, 111 (2000)). The categories of pre-emption are not

(continued...)

Second, the IIRAO contravenes congressional objectives by altering the employment verification scheme created by IRCA, and supplemented by IIRIRA and subsequent legislation. While IRCA affords an affirmative defense to any employer who uses the I-9 process to verify the work authorization of its employees, the IIRAO does not. The IIRAO provides its safe harbor only to employers who use E-Verify. In this way, the IIRAO significantly alters the risk calculus for employers, and coerces use of E-Verify.[35] The IIRAO also directly compels

---

[34](...continued)
"rigidly distinct. Indeed, field pre-emption may be understood as a species of conflict pre-emption: A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation." *English*, 496 U.S. at 79 n.5. If Congress, in service of the goal of minimizing employer burden, intended for its adjudicative system to be exclusive, IRCA would occupy the field of prosecuting and adjudicating employers for the hiring of unauthorized aliens.

[35] Throughout its brief, Hazleton makes much of the fact that the IIRAO does not actually "coerce" employers to use E-Verify (or as we discuss later, to verify the work authorization of independent contractors) because even though safe harbor is provided only to those employers who use E-Verify, employers are given the opportunity to terminate an unauthorized alien before sanctions are imposed, thus making a safe harbor less essential. The argument is the proverbial "red herring."

It is clear that Hazleton significantly incentivizes use of E-Verify. However one characterizes this coercion, it is inconsistent with congressional intent. The IIRAO plainly alters the riskiness of choosing not to use E-Verify (or choosing not to verify the work authorization of independent contractors). The anxiety associated with these choices is itself a burden from which Congress intended

(continued...)

City agencies, City contractors, and all employers twice found guilty of violating the IIRAO to use E-Verify. These provisions contradict congressional intent for E-Verify to remain fully voluntary for the vast majority of employers – a decision that, once again, balances seeking efficacy in employment authorization verification with the goals of minimizing employer burden and preventing employment discrimination. *See Geier*, 529 U.S. at 878 (finding state law imposing a specific requirement conflict pre-empted where Congress "deliberately sought variety" and to provide "several different" options). Similarly, they contravene congressional intent for the I-9 process to serve as a universal protection against sanctions.

As Plaintiffs pointed out at oral argument, if Congress were solely concerned with ensuring that no unauthorized alien ever secured employment in the United States, it would have and could have found a better mechanism for verifying employment authorization than the I-9 process. The I-9 process is not foolproof, and yet it remains the default employment

---

[35](...continued) to protect employers. *See, e.g.*, H.R. Rep. No. 99-682(I), at 16 (limiting the scope of employers' responsibilities to reduce the "concern[s]" of "cautious employers").

verification system twenty-four years after IRCA's enactment. This reflects Congress's determination that E-Verify, which advances certain federal objectives to the detriment of others, is not yet appropriate for mandated use.

At least for certain categories of employees, studies have shown that E-Verify is more effective than the I-9 process for determining whether an employee is authorized to work in the United States. *See* U.S. Citizenship and Immigration Services, *Report to Congress on the Basic Pilot Program*, June 2004, at 3 (The program "reduced unauthorized employment among participating employers by permitting employers to determine whether the information provided by employees on I-9 forms is consistent with information on SSA and DHS databases."). However, because of problems with the relevant databases, E-Verify has been alarmingly ineffective in verifying the employment authorization of work-authorized aliens and naturalized citizens, and thus has effectively resulted in discrimination against these groups. *See id.* ("[T]he tentative nonconfirmation rate was unacceptably high for foreign-born *work-authorized* employees and was higher than desirable for U.S.-born employees. This created burdens for employees and

118

employers . . . and led to unintentional discrimination against foreign-born persons.").

As of the last congressionally-mandated evaluation of E-Verify in 2007, foreign-born work-authorized employees were still thirty times more likely to receive tentative nonconfirmations than employees born in the United States, *see* Westat, *Findings of the Web Basic Pilot Evaluation* ("*2007 Findings*") (September 2007), at xxv, and foreign-born United States citizens were seven times more likely to receive erroneous tentative nonconfirmations than work-authorized aliens, *see id.* This study thus made clear that "further improvements are needed" before E-Verify could be made mandatory. *See id.*, at xxi. Accordingly, through various expansions of the program, Congress has continually required that E-Verify be strictly voluntary for the vast majority of employers. *See, e.g*, Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 547, 123 Stat. 2177; Consolidated Security, Disaster Assistance, and Continuing Appropriations Act, 2009, Pub. L. No. 110-329, Div. A, § 143, 122 Stat. 3574, 3580 (2008); Basic Pilot Program Extension and Expansion Act of 2003, Pub. L. No. 108-156, §§

2, 3, 117 Stat. 1944 (2003); Basic Pilot Extension Act of 2001, Pub. L. No. 107-128, § 2, 115 Stat. 2407 (2002).

The voluntariness of the system protects employers as well as employees. E-Verify has costs, including set-up and training expenses. *See 2007 Findings*, at xxvi; *Edmondson*, 594 F.3d at 756 (E-Verify has significant costs "in the form of implementation and training expenses."). Given the problems with the system, these costs are not yet a reliable investment. Moreover, E-Verify continues to operate on a trial basis, and absent action by Congress, its statutory authorization will terminate in 2012. *See* Department of Homeland Security Appropriations Act, 2010, Pub. L. No. 111-83, § 547, 123 Stat. 2177. Mandating E-Verify now therefore requires employers to incur costs that may be entirely worthless in the long-run. In all these ways, Congress's refusal to make E-Verify mandatory is consistent with its objective of ensuring that IRCA imposes the "minimum burden necessary . . . to be effective." *See* 132 Cong. Rec. H10583-01 (daily ed. Oct. 15, 1986) (statement of Rep. Bryant).

Additionally, Hazleton's scheme increases the burden on interstate employers by failing to provide safe harbor for those

who use the I-9 process.  As the court explained in *Edmondson*, "[b]y making the I-9 system a uniform national requirement, Congress limited the compliance burden on interstate corporations while facilitating uniform enforcement." 594 F.3d at 767.  A uniform system reduces costs for employers with multiple locations throughout the country by ensuring that the same human resources procedures can be used in all locations. Hazleton's scheme denies interstate employers who use the I-9 process the benefits of uniformity.  Interstate employers with locations in Hazleton (who wish to ensure safe harbor in all locations) would either have to adhere to different regulations in different locations, or use E-Verify in all locations.

In its defense, Hazleton argues that the other courts that have considered the question of states' and localities' power to mandate E-Verify have concluded that there is insufficient evidence that Congress's refusal to allow the federal government to make E-Verify mandatory reflects an intent to deprive states and localities of the power to do so.  In *Chicanos Por La Causa*, for instance, the Court of Appeals for the Ninth Circuit concluded that an Arizona law that made use of E-Verify mandatory was not conflict pre-empted.  It explained that the

fact that "Congress made participation in E-Verify voluntary at the national level . . . did not in and of itself indicate that Congress intended to prevent states from making participation mandatory." *See Chicanos Por La Causa*, 558 F.3d at 866-67. Similarly, in *Gray*, the District Court for the Eastern District of Missouri declined to interpret "Congress's decision not to make [E-Verify] mandatory as restricting a state or local government's authority under the police powers." *Gray*, 2008 WL 294294, at *19. That court reasoned that a locality's mandating of E-Verify is consistent with the federal goal of "greater enforcement." *Id.*

These decisions, however, fail to afford proper weight to the purposes underlying Congress's decision to retain E-Verify as a voluntary program. Despite its advantages, E-Verify also has significant problems, and accordingly mandating its use interferes with the balancing of interests embodied in IRCA. The conclusion that mandating E-Verify is consistent with the goal of "greater enforcement" thus simply ignores that enforcement is not Congress's only concern. Again, Hazleton has placed a priority on deterring employment of unauthorized aliens, but failed to concern itself with the costs its ordinance imposes on employers and on work-authorized aliens.

122

There is yet another way in which the IIRAO obstructs the congressional purposes underlying IRCA. The IIRAO coerces employers to verify the work authorization of independent contractors, even though Congress purposely excluded independent contractors from IRCA's verification requirements. Although employers do face liability under IRCA for *knowingly* utilizing the services of independent contractors who are unauthorized aliens, they are not required to actually verify contractors' work eligibility, as they must with employees. *See* 8 U.S.C. § 1324a(a). Thus, employers can utilize contractors' services without incurring the expense of verification, or the anxiety of potential sanctions. The IIRAO, on the other hand, does not distinguish between employees and independent contractors, and thus effectively coerces businesses to verify their contractors' authorization. *See* IIRAO § 4A. In so doing, the IIRAO fundamentally alters a business's relationship with its contractors and undermines the careful balancing of objectives Congress intended.

In drafting IRCA, Congress explicitly declined to sanction employers based on the work authorization status of "casual hires (i.e., those that do not involve the existence of an

123

employer/employee relationship)." H.R. Rep. No. 99-682(I), at 11. This was not an unreasoned choice, but part of the crafting of the statute to minimize the burden placed on employers. As the court explained in *Edmondson*, "[e]mployers are not required [under federal law] to verify the work eligibility of independent contractors" because it "would increase the burdens on business." 594 F.3d at 767. Businesses utilize independent contractors, in part, to reduce the costs and liabilities associated with procuring labor when an enduring and structured relationship is not needed. Compelling businesses to concern themselves with the work authorization status of contractors alters this relationship, and also raises costs.

Ironically, the IIRAO is equally problematic for pre-emption purposes because it only coerces but does not directly require verification of independent contractors' work authorization, while imposing sanctions on employers if their contractors are unauthorized. Although earlier versions of the bills that became IRCA did not require employers to use an employment verification system, Congress ultimately decided that a mandatory and uniformly used employment verification system *must* be a counterpart of employer sanctions. Absent that

124

requirement, Congress concluded, employers would too often "guess" about their prospective hires' work authorization. *See* H.R. Rep. No. 99-682(I), at 23 ("[T]he bill does provide substantial protections against discrimination in the form of a uniform verification process for all new hires."); S. Rep. No. 99-132, at 23 ("To be nondiscriminatory . . . any employee eligibility system must apply equally to each member of the U.S. workforce."). Guesswork unavoidably yields discrimination in hiring, and that result could not be more at odds with congressional intent.[36]

Hazleton's failure to balance its sanctions with anti-discrimination protections is a final area in which the

---

[36] Plaintiffs also argue that the IIRAO stands as an obstacle to IRCA in several other ways. They argue that it: requires employers to verify the employment authorization of casual domestic laborers, another group purposefully excluded from IRCA's verification requirements; requires unions to verify the work authorization of members they refer for work in certain instances, when unions operating in this capacity were also purposefully excluded from IRCA's verification requirements; and denies to employees the "cure period" available under federal law to establish work authorization after receiving a tentative nonconfirmation from E-Verify. Hazleton contests that the IIRAO's employment provisions operate in these ways, and the language of the ordinance in ambiguous. Furthermore, the district court did not make any findings that would allow us to resolve these claims. Accordingly, we do not factor these considerations into our pre-emption analysis. As we have explained, "hypothetical" conflicts usually will not support a finding of pre-emption. *See Schneidewind*, 485 U.S. at 310.

employment provisions of the IIRAO significantly conflict with IRCA. Congress was clear that "a mechanism to remedy any discrimination that [occurs because of employer sanctions] must be a part of" employer sanctions legislation. H.R. Rep. No. 99-682(I), at 22. Hazleton contends that IRCA's anti-discrimination provision fully accomplishes the congressional goal of deterring unlawful discrimination, and that it is not compelled to duplicate federal efforts. Hazleton misses the point.

While drafting IRCA, Congress heard testimony that imposing employer sanctions would create economic incentives for employers to discriminate against workers who appeared to be of foreign origin. If hiring unauthorized aliens were penalized, but discriminating against authorized foreign workers were not, employers might rationally choose not to hire anyone who appeared "foreign" in an effort to avoid entirely the threat of sanctions. *See, e.g.*, 132 Cong. Rec. S16879-01 (daily ed. Oct. 17, 1986) (statement of Sen. Hart) ("The employer sanctions in the legislation will undoubtedly act as an incentive for businesses to 'play it safe' and refuse to hire individuals whose status may be in question. This would mean that

[B]lacks, Hispanics, and Asians would encounter new difficulties in getting hired."). Consequently, Congress decided that IRCA must allow judges to impose on employers who discriminate in hiring penalties of the *exact same magnitude* as imposed on employers who hire unauthorized aliens. *Compare* 8 U.S.C. § 1324a(e)(4)(A)(i)-(iii) *with* 8 U.S.C. § 1324b(g)(2)(B)(iv)(I)-(III).

The IIRAO's employment provisions upset this careful balance. By imposing additional sanctions on employers who hire unauthorized aliens, while not penalizing those who discriminate, Hazleton has elected to place all of its weight on one side of the regulatory scale. This creates the exact situation that Congress feared: a system under which employers might quite rationally choose to err on the side of discriminating against job applicants they perceive to be foreign. This is inconsistent with IRCA and therefore cannot be tolerated under the Supremacy Clause.

Hazleton attempts to parry the thrust of this argument by again relying on the decisions in *Chicanos Por La Causa* and *Gray*. Those courts rejected the argument that licensing laws that revoked the licenses of businesses who employed

127

unauthorized aliens were likely to increase discrimination, and would contravene IRCA absent an anti-discrimination component.

We believe those decisions undervalue the emphasis Congress placed on preventing discrimination, and the painstaking care Congress took to achieve that objective. For example, the courts in both *Chicanos Por La Causa* and *Gray* demanded proof that employer sanctions result in discrimination. That is puzzling because Congress has already addressed that question. Although Congress could not have been certain that one-sided sanctions would lead to future discrimination when it enacted IRCA, it was sufficiently troubled by the likelihood to commit to preventative action. *See* H.R. Rep. No. 99-682(II), at 4, reprinted in 1986 U.S.C.C.A.N. 5757 (The "House of Representatives recognized [the] potential for this unfortunate cause and effect relationship between sanctions enforcement and resulting employment discrimination"). Notably, Congress also required the Comptroller General to report, three years after IRCA's enactment, on whether employer sanctions had resulted in discrimination. The Comptroller General concluded that

employer sanctions had caused "widespread discrimination." U.S. Gov't Accountability Office, GAO/T-GGD-90-31, *Testimony on Immigration Reform: Employer Sanctions and the Question of Discrimination* (1990).

Congress stated repeatedly that countervailing anti-discrimination protections *must* be a part of any employer sanctions legislation, *see* H.R. Rep. No. 99-682(II), at 4 ("[I]f there is to be sanctions enforcement and liability, there must be an *equally strong* and readily available remedy if resulting employment discrimination occurs.") (emphasis added), and we think this just as true when states and localities regulate in this area. To be consistent with federal law, states and localities that use regulatory enactments to sanction employers who have been found guilty of employing unauthorized aliens under IRCA must impose *sanctions of equal severity* on employers found guilty of discriminating.

Hazleton attempts to shield its legislative efforts from pre-emption based on the doctrine of "concurrent enforcement," but this could not be less persuasive. As Hazleton itself acknowledges, "concurrent enforcement activity is authorized" only where "state enforcement activities *do not impair federal*

129

*regulatory interests*." Hazleton's Br. 57 (quoting *Gonzales v. City of Peoria*, 722 F.2d 468, 474 (9th Cir. 1983), *overruled on other grounds by*, *Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999)) (emphasis added). Hazleton claims that the IIRAO satisfies this standard because "the employment provisions . . . were drafted with meticulous care to match the terminology and scope of federal law." Hazleton's Br. 58. Given our discussion thus far, we need not belabor here explaining why this assertion is wrong. Simply put, Hazleton has enacted a regulatory scheme that is designed to further the single objective of federal law that it deems important – ensuring unauthorized aliens do not work in the United States. It has chosen to disregard Congress's other objectives – protecting lawful immigrants and others from employment discrimination, and minimizing the burden imposed on employers. Regulatory "cherry picking" is not concurrent enforcement, and it is not constitutionally permitted.

Notably, this is not the first time that we have confronted a local law that skews the federal government's careful balancing of objectives in the regulation of alien employment. We addressed a similar situation over thirty years ago in *Rogers*

130

*v. Larson*, 563 F.2d 617 (1977). There, the Government of the Virgin Islands had enacted a law which called for the replacement of certain nonimmigrant alien workers with qualified citizens or lawful permanent resident workers, if and when such workers became available. Nonimmigrant aliens brought suit arguing that the territorial law was pre-empted by the INA, and in particular by federal regulations guaranteeing nonimmigrant aliens' employment for definite periods of time. We agreed.

In striking down the Virgin Islands' legislative effort as an obstacle to the congressional purposes underlying the INA, we made clear that the fact that the two statutory schemes shared purposes in common did not save the territorial law from pre-emption. Rather, the laws were directly at odds with each other because they "str[uck] the balance between [the] goals differently." *Id.* at 626. The Virgin Islands statute struck the balance "more in the direction of protection of citizen-workers," and federal law struck it more in the direction of protection of employers and alien workers. *Id.* "Because of the different emphasis the two statutory schemes place[d] on the purposes of job protection and an adequate labor force," the Virgin Islands

131

provision was invalid under the Supremacy Clause. *Id.* The same is just as true here.

It is, of course, not our job to sit in judgment of whether state and local frustration about federal immigration policy is warranted. We are, however, required to intervene when states and localities directly undermine the federal objectives embodied in statutes enacted by Congress. The employment provisions of the IIRAO "stand[] as an obstacle to the accomplishment and execution" of IRCA's objectives, *Hines*, 312 U.S. at 67, and thus are pre-empted.

**2. Housing Provisions**

Our final inquiry addresses Plaintiffs' claim that the housing provisions of the IIRAO and the RO are pre-empted. The district court agreed with Plaintiffs, and so do we.

Before delving into the substance of this analysis, however, we must first consider whether the presumption against pre-emption applies to the housing provisions. The district court did not distinguish between the employment and housing provisions in addressing the presumption; it summarily concluded that both operate in the field of "immigration," and that because of the "history of significant federal presence" in

132

that area, the presumption did not apply. *Lozano*, 496 F. Supp. 2d at 518 n.41. We have explained why that conclusion was erroneous as applied to the employment provisions, which under *DeCanas*, fall within the states' historic police powers. The housing provisions, however, raise a very different issue. As the District Court for the Northern District of Texas explained in *Farmers Branch III*, "[l]ocal regulation that conditions the ability to enter private contract for shelter on federal immigration status is of a fundamentally different nature than . . . restrictions on employment." ___ F. Supp. 2d ___, 2010 WL 1141398, at *16.

The parties characterize the housing provisions of the RO and the IIRAO in starkly different terms. Hazleton maintains that the housing provisions regulate rental accommodations, and thus, like the employment provisions, fall within the state's historic police powers. Plaintiffs, on the other hand, argue that these provisions regulate *who may live* in Hazleton based on immigration status, and that regulating which aliens are permitted to reside in the United States is a historically federal function far beyond the police powers of any state.

Although we realize that a state certainly can, and

133

presumably should, regulate rental accommodations to ensure the health and safety of its residents, and that such regulation may permissibly affect the rights of persons in the country unlawfully, *see DeCanas*, 424 U.S. at 355, we cannot bury our heads in the sand ostrich-like ignoring the reality of what these ordinances accomplish. Through its housing provisions, Hazleton attempts to regulate residence based solely on immigration status. Deciding which aliens may live in the United States has always been the prerogative of the federal government. Hazleton purposefully chose to enter this area of "significant federal presence." *Locke*, 529 U.S. at 108. Accordingly, we will not presume nonpre-emption.

The rest of our analysis flows directly from our conclusion that Hazleton's housing provisions regulate which aliens may live there. Under *DeCanas*, a state or locality may not "regulate immigration," which the Supreme Court has defined as any attempt to determine "who should or should not be admitted into the country, and the conditions under which a legal entrant may remain." *DeCanas*, 424 U.S. at 355. Such power is delegated by the Constitution exclusively to the federal government, and even if Congress had never acted in the field,

134

states and localities would be precluded from doing so. *See id.* Thus, over a century ago, the Supreme Court explained that: "[t]he doctrine is firmly established that the power to exclude or expel aliens is vested in the political departments of the [federal] government, to be regulated by treaty or by act of Congress." *Yo v. United States*, 185 U.S. 296, 302 (1902). Whether Hazleton inadvertently stumbled into this exclusively federal domain, or decided to defiantly barge in, it is clear that it has attempted to usurp authority that the Constitution has placed beyond the vicissitudes of local governments.

The housing provisions of the IIRAO and the RO are also field pre-empted by the INA. As the Supreme Court explained in *DeCanas*, the central concern of the INA is with "the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." 424 U.S. at 359. The "comprehensiveness of the INA scheme for regulation of immigration and naturalization," *id.*, plainly precludes state efforts, whether harmonious or conflicting, to regulate residence in this country based on immigration status.

We recognize, of course, that Hazleton's housing provisions neither control actual physical entry into the City, nor

135

physically expel persons from it. Nonetheless, "[i]n essence," that is precisely what they attempt to do. *Bonito Boats*, 489 U.S. at 160. "It is difficult to conceive of a more effective method" of ensuring that persons do not enter or remain in a locality than by precluding their ability to live in it. *Id.*

At oral argument, Hazleton posited that aliens lacking lawful status could still reside in the City through purchasing a home, or through staying with friends.[37] The response is as disingenuous as it is unrealistic. There is nothing on this record that suggests that the people whom the residential provisions are aimed at could avail themselves of such options. Even if they were viable alternatives for some, however, many others still would be excluded, and that is sufficient for these provisions to be pre-empted.

We also recognize that Hazleton's housing provisions regulate presence only within its city limits, not the entire country. This does not change the analysis. To be meaningful,

---

[37] We point out that they could stay with friends only if those friends owned property and did not rent. Authorized occupants of apartments who permit persons lacking lawful immigration status to stay with them are also fined under the RO: "$1000 for each . . . Occupant . . . that does not have an occupancy permit" and $100 per day per any such Occupant until the violation is corrected. RO § 10b.

the federal government's exclusive control over residence in this country must extend to any political subdivision. Again, it is not only Hazleton's ordinance that we must consider. If Hazleton can regulate as it has here, then so could every other state or locality. *See Rowe*, 552 U.S. at 373. As the District Court for the Northern District of Texas reasoned: "we can imagine the slippery slope . . . if every local and state government enacted laws purporting to determine that . . . [certain persons] could not stay in their bounds. If every city and state enacted and enforced such laws . . . the federal government's control over decisions relating to immigration would be effectively eviscerated." *Villas at Parkside Partners v. City of Farmers Branch ("Farmers Branch I")*, No. 3:08-cv-1551-B, Hrg. Tr. at 136 (N.D. Tex. Sept. 12, 2008). Indeed, the record strongly suggests that Hazleton's mayor intended these provisions to be at the forefront of exactly such an evisceration. *See supra* note 31.

The housing provisions of the IIRAO and the RO are also conflict pre-empted by the INA. As the district court explained, these provisions attempt to effectively "remove" persons from Hazleton based on a snapshot of their current immigration status, rather than based on a federal order of removal. This is

fundamentally inconsistent with the INA.

Hazleton goes to great lengths to defend its housing provisions as providing for an accurate assessment of tenants' immigration status, and only denying housing to those whom the federal government confirms are here unlawfully. Even assuming Hazleton is correct, this argument does not advance Hazleton's cause; rather, it highlights the fundamental misconception at the heart of these ordinances. Through its housing provisions, Hazleton attempts to remove persons from the community based on *current* immigration status. However, as Justice Blackmun explained in *Plyler*: "the structure of the immigration statutes makes it impossible for the State to determine which aliens are entitled to residence, and which eventually will be deported." 457 U.S. at 236 (Blackmun, J., concurring).

Under federal law, an unlawful immigration status does not lead instantly, or inevitably, to removal. Under most circumstances, a federal removal hearing under section 240 of the INA is required. Absent certain limited exceptions, this proceeding is the "sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the

alien has been so admitted, removed from the United States."

8 U.S.C. § 1229a(a)(3). As we explained in detail above, knowing whether the government will decide to initiate proceedings against a particular alien is as impossible as trying to predict the outcome of such a proceeding once initiated.

The federal government has discretion in deciding whether and when to initiate removal proceedings. *See Juarez*, 599 F.3d at 566. As the district court found, the government purposefully exercises its discretion not to prosecute in certain instances, and thereby tacitly allows the presence of those whose technical status remains "illegal." *See Lozano*, 496 F. Supp. 2d at 531 n.56. Furthermore, once the government initiates these proceedings, whether they will result in removal is far from certain. A judge may award discretionary relief saving a removable alien from removal, or even adjusting that alien's status to that of lawful permanent resident. *See* 8 U.S.C. § 1229b. Thus, for these reasons, it is simply:

> impossible for a State to determine which aliens the Federal Government will eventually deport, which the Federal Government will permit to stay, and which the Federal Government will ultimately naturalize. Until an undocumented alien is ordered deported by the Federal Government, no State can be assured that the alien will not be

found to have a federal permission to reside in the country, perhaps even as a citizen. Indeed, even the Immigration and Naturalization Service cannot predict with certainty whether any individual alien has a right to reside in the country until deportation proceedings have run their course.

*Plyler*, 457 U.S. at 241 n.6 (Powell, J., concurring).

Stitched into the fabric of Hazleton's housing provisions, then, is either a lack of understanding or a refusal to recognize the complexities of federal immigration law. Hazleton would effectively remove from its City an alien college student the federal government has purposefully declined to initiate removal proceedings against.[38] So too would Hazleton remove an alien battered spouse, currently unlawfully present, but eligible for adjustment of status to lawful permanent resident under the special protections Congress has afforded to battered spouses and children. *See* 8 U.S.C. § 1229b(b)(2). In each of these instances, as in every single instance in which Hazleton would deny residence to an alien based on immigration status rather than on a federal order of removal, Hazleton would act directly in opposition to federal law.

---

[38] *See* Julia Preston, *Students Spared Amid an Increase in Deportations*, N.Y. Times, Aug. 9, 2010.

Hazleton attempts to avoid this result by again relying on the concept of "concurrent enforcement" to defend its housing provisions. According to Hazleton, its housing provisions mirror the INA's prohibition against "harboring," which imposes criminal penalties on:

> Any person who . . . knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation.

8 U.S.C. § 1324(a)(1)(A)(iii). Hazleton contends that since federal courts have consistently found that providing housing to aliens lacking lawful immigration status constitutes unlawful "harboring," its housing provisions do no more than concurrently enforce federal law. Hazleton is wrong.

As we have explained, Hazleton's housing provisions operate in a field which the federal government exclusively occupies. Therefore, even if Hazleton's housing provisions did concurrently enforce federal law, this would not save them; even harmonious regulation is pre-empted here. However, Hazleton is also plainly incorrect in claiming that its housing provisions

"mirror" federal law.  The federal prohibition against harboring has never been interpreted to apply so broadly as to encompass the typical landlord/tenant relationship.

8 U.S.C. § 1324(a)(1)(A)(iii) criminalizes harboring an alien, knowing or in reckless disregard of the fact that the alien came to, or remains in, the United States in violation of law. The statute, however, does not define the term "harboring," and the Supreme Court has yet to do so.  As a result, the breadth of the term is currently in dispute among the Circuit Courts of Appeals.  Some courts, our own included, have found that culpability requires some conduct that helps to conceal an alien from authorities.  We, along with the Court of Appeals for the Second Circuit, define "harboring" as conduct "tending to substantially facilitate an alien's remaining in the United States illegally *and to prevent government authorities from detecting the alien's unlawful presence*."  *United States v. Ozcelik*, 527 F.3d 88, 100 (3d Cir. 2008) (internal quotation marks omitted) (emphasis added); *see also United States v. Kim*, 193 F.3d 567, 574 (2d Cir. 1999) (Harboring "encompasses conduct tending substantially to facilitate an alien's remaining in the United States illegally *and* to prevent government authorities from

142

detecting his unlawful presence.") (emphasis added). Thus, we have held that "harboring" requires some act of obstruction that reduces the likelihood the government will discover the alien's presence. It is highly unlikely that a landlord's renting of an apartment to an alien lacking lawful immigration status could ever, without more, satisfy this definition of harboring. Renting an apartment in the normal course of business is not in and of itself conduct that prevents the government from detecting an alien's presence.

It is true that other Courts of Appeals have held that a showing of concealment is unnecessary, and that conduct which merely "substantially facilitates an alien's remaining in the country illegally" is sufficient to constitute harboring. *See, e.g.*, *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008) (internal alteration omitted). However, even under the more lenient tests of these jurisdictions, we are not aware of any case in which someone has been convicted of "harboring" merely because s/he rented an apartment to someone s/he knew (or had reason to know) was not legally in the United States.

Notably, all the cases cited by Hazleton for that proposition involve defendants who played a much more active

143

role in helping an alien remain in the United States. *See, e.g.*, *Tipton*, 518 F.3d at 595 (defendant *employer* who employed and housed six unauthorized alien employees, provided them with transportation and money to purchase necessities, and maintained counterfeit immigration papers for them guilty of harboring); *United States v. Zheng*, 306 F.3d 1080, 1082 (11th Cir. 2002) (defendant *employer* who permitted ten to twenty unauthorized alien employees, who were overworked and underpaid, to live at his house in "barrack-like accommodations" without paying rent guilty of harboring); *Kim*, 193 F.3d at 574-75 (defendant *employer* who advised unauthorized alien employees to change names and acquire false documentation guilty of harboring); *United States v. Sanchez*, 963 F.2d 152, 155 (8th Cir. 1992) (defendant *employer* who paid to rent an apartment for unauthorized alien employees, provided them with transportation to and from work, and offered to obtain immigration papers for them guilty of harboring). None of these cases involve anything verging on a simple landlord/tenant relationship. Rather, the fact that so many of these cases involve employers emphasizes that something much more is needed to turn renting a residential unit into harboring.

Furthermore, regardless of the breadth of the term "harboring" in and of itself, there is no question that harboring is illegal under federal law only if a defendant knew or was in reckless disregard of the harbored alien's immigration status. *See* 8 U.S.C. § 1324(a). Hazleton argues that the housing provisions of the IIRAO similarly only prohibit renting to persons known to lack lawful immigration status. This isolated reading of the IIRAO is misleading. Taken together, the IIRAO and the RO not only prohibit the knowing harboring of (defined to include the rental of housing to) certain aliens, but also make legal immigration status a *qualification* for occupancy of rental housing. Although the typical landlord might never know of her/his tenant's immigration status, Hazleton's provisions collectively require that any provider of rental housing be put on notice about the immigration status of potential renters. *See* *Lozano*, 496 F. Supp. 2d at 493 (Espinal testified that "he understood the ordinances to require that he obtain information on immigration status from tenants that he normally would not seek.").

Although the federal government does not intend for aliens here unlawfully to be harbored, it has never evidenced an

145

intent for them to go homeless. *Cf.* 8 U.S.C. § 1229(a)(1)(F)(i) (explaining that an alien noticed to appear for a removal proceeding must immediately provide the Attorney General "with a written record of an address . . . at which the alien may be contacted respecting [the] proceeding."). Common sense, of course, suggests that Hazleton has absolutely no interest in reducing aliens without legal status to homelessness either. No municipality would benefit from forcing any group of residents ("legal" or "illegal") onto its streets. Rather, it appears plain that the purpose of these housing provisions is to ensure that aliens lacking legal immigration status reside somewhere other than Hazleton. It is this power to effectively prohibit residency based on immigration status that is so clearly within the exclusive domain of the federal government.

In sum, we find the housing provisions of Hazleton's ordinances pre-empted regulations of immigration, and both field and conflict pre-empted by the INA.

### VII. CONCLUSION

For the reasons set forth above, we affirm in part and reverse in part the district court's order permanently enjoining Hazleton's enforcement of the IIRAO and the RO.

146

# VIII. APPENDIX

## A. The Illegal Immigration Relief Act Ordinance

**(Ordinance 2006-18, as amended by Ordinances 2006-40 and 2007-7)**

ILLEGAL IMMIGRATION RELIEF ACT ORDINANCE

BE IT ORDAINED BY THE COUNCIL OF THE CITY OF HAZLETON AS FOLLOWS:

SECTION 1. TITLE

This chapter shall be known and may be cited as the "City of Hazleton Illegal Immigration Relief Act Ordinance."

SECTION 2. FINDINGS AND DECLARATION OF PURPOSE

The People of the City of Hazleton find and declare:

A. That state and federal law require that certain conditions be met before a person may be authorized to work or reside in this country.

B. That unlawful workers and illegal aliens, as defined by this ordinance and state and federal law, do not normally meet such conditions as a matter of law when present in the City of Hazleton.

C. That unlawful employment, the harboring of illegal aliens in

147

dwelling units in the City of Hazleton, and crime committed by illegal aliens harm the health, safety and welfare of authorized US workers and legal residents in the City of Hazleton. Illegal immigration leads to higher crime rates, subjects our hospitals to fiscal hardship and legal residents to substandard quality of care, contributes to other burdens on public services, increasing their cost and diminishing their availability to legal residents, and diminishes our overall quality of life.

D. That the City of Hazleton is authorized to abate public nuisances and empowered and mandated by the people of Hazleton to abate the nuisance of illegal immigration by diligently prohibiting the acts and policies that facilitate illegal immigration in a manner consistent with federal law and the objectives of Congress.

E. That United States Code Title 8, subsection 1324(a)(1)(A) prohibits the harboring of illegal aliens. The provision of housing to illegal aliens is a fundamental component of harboring.

F. This ordinance seeks to secure to those lawfully present in the United States and this City, whether or not they are citizens of the United States, the right to live in peace free of the threat

crime, to enjoy the public services provided by this city without being burdened by the cost of providing goods, support and services to aliens unlawfully present in the United States, and to be free of the debilitating effects on their economic and social well being imposed by the influx of illegal aliens to the fullest extent that these goals can be achieved consistent with the Constitution and Laws of the United States and the Commonwealth of Pennsylvania.

G. The City shall not construe this ordinance to prohibit the rendering of emergency medical care, emergency assistance, or legal assistance toany person.

SECTION 3. DEFINITIONS

When used in this chapter, the following words, terms and phrases shall have the meanings ascribed to them herein, and shall be construed so as to be consistent with state and federal law, including federal immigration law:

A. "Business entity" means any person or group of persons performing or engaging in any activity, enterprise, profession, or occupation for gain, benefit, advantage, or livelihood, whether for profit or not for profit.

(1) The term business entity shall include but not be limited to

selfemployed individuals, partnerships, corporations, contractors, and subcontractors.

(2) The term business entity shall include any business entity that possesses a business permit, any business entity that is exempt by law from obtaining such a business permit, and any business entity that is operating unlawfully without such a business permit.

B. "City" means the City of Hazleton.

C. "Contractor" means a person, employer, subcontractor or business entity that enters into an agreement to perform any service or work or to provide a certain product in exchange for valuable consideration. This definition shall include but not be limited to a subcontractor, contract employee, or a recruiting or staffing entity.

D. "Illegal Alien" means an alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, section 1101 et seq. The City shall not conclude that a person is an illegal alien unless and until an authorized representative of the City has verified with the federal government, pursuant to United States Code Title 8, subsection 1373(c), that the person is an alien who is not lawfully present

in the United States.

E. "Unlawful worker" means a person who does not have the legal right or authorization to work due to an impediment in any provision of federal, state or local law, including but not limited to a minor disqualified by nonage, or an unauthorized alien as defined by United States Code Title 8, subsection 1324a(h)(3).

F. "Work" means any job, task, employment, labor, personal services, or any other activity for which compensation is provided, expected, or due, including but not limited to all activities conducted by business entities.

G. "Basic Pilot Program" means the electronic verification of work authorization program of the Illegal Immigration Reform and Immigration Responsibility Act of 1996, P.L. 104-208, Division C, Section 403(a); United States Code Title 8, subsection 1324a, and operated by the United States Department of Homeland Security (or a successor program established by the federal government.)

SECTION 4. BUSINESS PERMITS, CONTRACTS, OR GRANTS

A. It is unlawful for any business entity to knowingly recruit, hire for employment, or continue to employ, or to permit,

dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City. Every business entity that applies for a business permit to engage in any type of work in the City shall sign an affidavit, prepared by the City Solicitor, affirming that they do not knowingly utilize the services or hire any person who is an unlawful worker.

B. Enforcement: The Hazleton Code Enforcement Office shall enforce the requirements of this section.

(1) An enforcement action shall be initiated by means of a written signed complaint to the Hazleton Code Enforcement Office submitted by any City official, business entity, or City resident. A valid complaint shall include an allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred.

(2) A complaint which alleges a violation on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced.

(3) Upon receipt of a valid complaint, the Hazleton Code Enforcement Office shall, within three business days, request identity information from the business entity regarding any

persons alleged to be unlawful workers. The Hazleton Code Enforcement Office shall suspend the business permit of any business entity which fails, within three business days after receipt of the request, to provide such information. In instances where an unlawful worker is alleged to be an unauthorized alien, as defined in United States Code Title 8, subsection 1324a(h)(3), the Hazleton Code Enforcement Office shall submit identity data required by the federal government to verify, pursuant to United States Code Title 8, section 1373, the immigration status of such person(s), and shall provide the business entity with written confirmation of that verification.

(4) The Hazleton Code Enforcement Office shall suspend the business permit of any business entity which fails correct a violation of this section within three business days after notification of the violation by the Hazleton Code Enforcement Office.

(5) The Hazleton Code Enforcement Office shall not suspend the business permit of a business entity if, prior to the date of the violation, the business entity had verified the work authorization of the alleged unlawful worker(s) using the Basic Pilot Program.

153

(6) The suspension shall terminate one business day after a legal representative of the business entity submits, at a City office designated by the City Solicitor, a sworn affidavit stating that the violation has ended.

(a) The affidavit shall include a description of the specific measures and actions taken by the business entity to end the violation, and shall include the name, address and other adequate identifying information of the unlawful workers related to the complaint.

(b) Where two or more of the unlawful workers were verified by the federal government to be unauthorized aliens, the legal representative of the business entity shall submit to the Hazleton Code Enforcement Office, in addition to the prescribed affidavit, documentation acceptable to the City Solicitor which confirms that the business entity has enrolled in and will participate in the Basic Pilot Program for the duration of the validity of the business permit granted to the business entity.

(7) For a second or subsequent violation, the Hazleton Code Enforcement Office shall suspend the business permit of a business entity for a period of twenty days. After the end of the

154

suspension period, and upon receipt of the prescribed affidavit, the Hazleton Code Enforcement Office shall reinstate the business permit. The Hazleton Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate federal enforcement agency, pursuant to United States Code Title 8, section 1373. In the case of an unlawful worker disqualified by state law not related to immigration, the Hazleton Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate state enforcement agency.

C. All agencies of the City shall enroll and participate in the Basic Pilot Program.

D. As a condition for the award of any City contract or grant to a business entity for which the value of employment, labor or, personal services shall exceed $10,000, the business entity shall provide documentation confirming its enrollment and participation in the Basic Pilot Program.

E. Private Cause of Action for Unfairly Discharged Employees

(1) The discharge of any employee who is not an unlawful worker by a business entity in the City is an unfair business practice if, on the date of the discharge, the business entity was

not participating in the Basic Pilot program and the business entity was employing an unlawful worker.

(2) The discharged worker shall have a private cause of action in the Municipal Court of Hazleton against the business entity for the unfair business practice. The business entity found to have violated this subsection shall be liable to the aggrieved employee for: (a) three times the actual damages sustained by the employee, including but not limited to lost wages or compensation from the date of the discharge until the date the employee has procured new employment at an equivalent rate of compensation, up to a period of one hundred and twenty days; and (b) reasonable attorney's fees and costs.

SECTION 5. HARBORING ILLEGAL ALIENS

A. It is unlawful for any person or business entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, unless such harboring is otherwise expressly permitted by federal law.

(1) For the purposes of this section, to let, lease, or rent a

dwelling unit to an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, shall be deemed to constitute harboring. To suffer or permit the occupancy of the dwelling unit by an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, shall also be deemed to constitute harboring.

(2) A separate violation shall be deemed to have been committed on each day that such harboring occurs, and for each adult illegal alien harbored in the dwelling unit, beginning one business day after receipt of a notice of violation from the Hazleton Code Enforcement Office.

(3) A separate violation of this section shall be deemed to have been committed for each business day on which the owner fails to provide the Hazleton Code Enforcement Office with identity data needed to obtain a federal verification of immigration status, beginning three days after the owner receives written notice from the Hazleton Code Enforcement Office.

B. Enforcement: The Hazleton Code Enforcement Office shall enforce the requirements of this section.

157

(1) An enforcement action shall be initiated by means of a written signed complaint to the Hazleton Code Enforcement Office submitted by any official, business entity, or resident of the City. A valid complaint shall include an allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred.

(2) A complaint which alleges a violation on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced.

(3) Upon receipt of a valid written complaint, the Hazleton Code Enforcement Office shall, pursuant to United States Code Title 8, section 1373(c), verify with the federal government the immigration status of a person seeking to use, occupy, lease, or rent a dwelling unit in the City. The Hazleton Code Enforcement Office shall submit identity data required by the federal government to verify immigration status. The City shall forward identity data provided by the owner to the federal government, and shall provide the property owner with written confirmation of that verification.

(4) If after five business days following receipt of written notice

from the City that a violation has occurred and that the immigration status of any alleged illegal alien has been verified, pursuant to United States Code Title 8, section 1373(c), the owner of the dwelling unit fails to correct a violation of this section, the Hazleton Code Enforcement Office shall deny or suspend the rental license of the dwelling unit.

(5) For the period of suspension, the owner of the dwelling unit shall not be permitted to collect any rent, payment, fee, or any other form of compensation from, or on behalf of, any tenant or occupant in the dwelling unit.

(6) The denial or suspension shall terminate one business day after a legal representative of the dwelling unit owner submits to the Hazleton Code Enforcement Office a sworn affidavit stating that each and every violation has ended. The affidavit shall include a description of the specific measures and actions taken by the business entity to end the violation, and shall include the name, address and other adequate identifying information for the illegal aliens who were the subject of the complaint.

(7) The Hazleton Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the

appropriate federal enforcement agency, pursuant to United States Code Title 8, section 1373.

(8) Any dwelling unit owner who commits a second or subsequent violation of this section shall be subject to a fine of two hundred and fifty dollars ($250) for each separate violation. The suspension provisions of this section applicable to a first violation shall also apply.

(9) Upon the request of a dwelling unit owner, the Hazleton Code Enforcement Office shall, pursuant to United States Code Title 8, section 1373(c), verify with the federal government the lawful immigration status of a person seeking to use, occupy, lease, or rent a dwelling unit in the City. The penalties in this section shall not apply in the case of dwelling unit occupants whose status as an alien lawfully present in the United States has been verified.

SECTION 6. CONSTRUCTION AND SEVERABILITY

A. The requirements and obligations of this section shall be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens and aliens.

B. If any part of provision of this Chapter is in conflict or

inconsistent with applicable provisions of federal or state statutes, or is otherwise held to be invalid or unenforceable by any court of competent jurisdiction, such part of provision shall be suspended and superseded by such applicable laws or regulations, and the remainder of this Chapter shall not be affected thereby.

SECTION 7. IMPLEMENTATION AND PROCESS

A. *Prospective Application Only*. The default presumption with respect to Ordinances of the City of Hazleton—that such Ordinances shall apply only prospectively—shall pertain to the Illegal Immigration Relief Act Ordinance. The Illegal Immigration Relief Act Ordinance shall be applied only to employment contracts, agreements to perform service or work, and agreements to provide a certain product in exchange for valuable consideration that are entered into or are renewed after the date that the Illegal Immigration Relief Act Ordinance becomes effective and any judicial injunction prohibiting its implementation is removed. The Illegal Immigration Relief Act Ordinance shall be applied only to contracts to let, lease, or rent dwelling units that are entered into or are renewed after the date that the Illegal Immigration Relief Act Ordinance becomes

effective and any judicial injunction prohibiting its implementation is removed.

The renewal of a month-to-month lease or other type of tenancy which automatically renews absent notice by either party will not be considered as entering into a new contract to let, lease or rent a dwelling unit.

B. *Condition of Lease*. Consistent with the obligations of a rental unit owner described in Section 5.A., a tenant may not enter into a contract for the rental or leasing of a dwelling unit unless the tenant is either a U.S. citizen or an alien lawfully present in the United States according to the terms of United States Code Title 8, Section 1101 et seq. A tenant who is neither a U.S. citizen nor an alien lawfully present in the United States who enters into such a contract shall be deemed to have breached a condition of the lease under 68 P.S. Section 250.501. A tenant who is not a U.S. citizen who subsequent to the beginning of his tenancy becomes unlawfully present in the United States shall be deemed to have breached a condition of the lease under 68 P.S. Section 250.501.

C. *Corrections of Violations—Employment of Unlawful Workers*. The correction of a violation with respect to the

employment of an unlawful worker shall include any of the following actions:

(1) The business entity terminates the unlawful worker's employment.

(2) The business entity, after acquiring additional information from the worker, requests a secondary or additional verification by the federal government of the worker's authorization, pursuant to the procedures of the Basic Pilot Program. While this verification is pending, the three business day period described in Section 4.B.(4) shall be tolled.

(3) The business entity attempts to terminate the unlawful worker's employment and such termination is challenged in a court of the Commonwealth of Pennsylvania. While the business entity pursues the termination of the unlawful worker's employment in such forum, the three business day period described in Section 4.B.(4) shall be tolled.

D. *Corrections of Violations—Harboring Illegal Aliens*. The correction of a violation with respect to the harboring of an illegal alien in a dwelling unit shall include any of the following actions:

(1) A notice to quit, in writing, issued and served by the

163

dwelling unit owner, as landlord, to the tenant declaring a forfeiture of the lease for breach of the lease condition describe in Section 7.B.

(2) The dwelling unit owner, after acquiring additional information from the alien, requests the City of Hazleton to obtain a secondary or additional verification by the federal government that the alien is lawfully present in the United States, under the procedures designated by the federal government, pursuant to United States Code Title 8, Subsection 1373(c). While this second verification is pending, the five business day period described in Section 5.B.(4) shall be tolled.

(3) The commencement of an action for the recovery of possession of real property in accordance with Pennsylvania law by the landlord against the illegal alien. If such action is contested by the tenant in court, the dwelling unit owner shall be deemed to have complied with this Ordinance while the dwelling unit owner is pursuing the action in court. While this process is pending, the five business day period described in Section 5.B.(4) shall be tolled.

E. *Procedure if Verification is Delayed*. If the federal government notifies the City of Hazleton that it is unable to

verify whether a tenant is lawfully present in the United States or whether an employee is authorized to work in the United States, the City of Hazleton shall take no further action on the complaint until a verification from the federal government concerning the status of the individual is received. At no point shall any City official attempt to make an independent determination of any alien's legal status, without verification from the federal government, pursuant to United States Code Title 8, Subsection 1373(c).

F. *Venue for Judicial Process*. Any business entity or rental unit owner subject to a complaint and subsequent enforcement under this ordinance, or any employee of such a business entity or tenant of such a rental unit owner, may challenge the enforcement of this Ordinance with respect to such entity or individual in the Magisterial District Court for the City of Hazleton, subject to the right of appeal to the Luzerne County Court of Common Pleas. Such an entity or individual may alternatively challenge the enforcement of this Ordinance with respect to such entity or individual in any other court of competent jurisdiction in accordance with applicable law, subject to all rights of appeal.

G. *Deference to Federal Determinations of Status*. The determination of whether a tenant of a dwelling is lawfully present in the United States, and the determination of whether a worker is an unauthorized alien shall be made by the federal government, pursuant to United States Code Title 8, Subsection 1373(c). A determination of such status of an individual by the federal government shall create a rebuttable presumption as to that individual's status in any judicial proceedings brought pursuant to this ordinance. The Court may take judicial notice of any verification of the individual previously provided by the federal government and may request the federal government to provide automated or testimonial verification pursuant to United States Code Title 8, Subsection 1373(c).

**B. Rental Registration Ordinance**

**(Ordinance 2006-13)**

ESTABLISHING A REGISTRATION PROGRAM FOR RESIDENTIAL RENTAL PROPERTIES; REQUIRING ALL OWNERS OF RESIDENTIAL RENTAL PROPERTIES TO DESIGNATE AN AGENT FOR SERVICE OF PROCESS; AND PRESCRIBING DUTIES OF OWNERS, AGENTS AND OCCUPANTS; DIRECTING THE DESIGNATION OF AGENTS; ESTABLISHING FEES FOR THE COSTS ASSOCIATED WITH THE REGISTRATION OF RENTAL PROPERTY; AND PRESCRIBING PENALTIES FOR VIOLATIONS BE IT ORDAINED BY THE GOVERNING BODY OF THE CITY OF HAZLETON AND IT IS HEREBY ORDAINED AND WITH THE AUTHORITY OF THE SAME AS FOLLOWS:

SECTION 1. DEFINITIONS AND INTERPRETATION.

The following words, when used in this ordinance, shall have the meanings ascribed to them in this section, except in those instances where the context clearly indicates otherwise. When not inconsistent with the context, words used in the present tense include the future; words in the plural number include the

singular number; words in the singular shall include the plural, and words in the masculine shall include the feminine and the neuter.

a. AGENT - Individual of legal majority who has been designated by the Owner as the agent of the Owner or manager of the Property under the provisions of this ordinance.

b. CITY - City of Hazleton

c. CITY CODE – the building code (property Maintenance Code 1996 as amendedor superceded) officially adopted by the governing body of the City, or other such codes officially designated by the governing body of the City for the regulation of construction, alteration, addition, repair, removal, demolition, location, occupancy and maintenance of buildings and structures.

d. ZONING ORDINANCE – Zoning ordinance as officially adopted by the City of Hazleton, File of Council # 95-26 (as amended).

e. OFFICE – The Office of Code Enforcement for the City of Hazleton.

f. DWELLING UNIT – a single habitable unit, providing living facilities for one or more persons, including permanent space for

168

living, sleeping, eating, cooking and bathing and sanitation, whether furnished or unfurnished. There may be more than one Dwelling Unit on a Premises.

g. DORMITORY - a residence hall offered as student or faculty housing to accommodate a college or university, providing living or sleeping rooms for individuals or groups of individuals, with or without cooking facilities and with or without private baths.

h. INSPECTOR - any person authorized by Law or Ordinance to inspect buildings or systems, e.g. zoning, housing, plumbing, electrical systems, heat systems, mechanical systems and health necessary to operate or use buildings within the City of Hazleton. An Inspector would include those identified in Section 8 – Enforcement.

i. FIRE DEPARTMENT – the Fire Department of the City of Hazleton or any member thereof, and includes the Chief of Fire or his designee.

j. HOTEL – a building or part of a building in which living and sleeping accommodations are used primarily for transient occupancy, may be rented on a daily basis, and desk service is provided, in addition to one or more of the following services:

maid, telephone, bellhop service, or the furnishing or laundering of linens.

k. LET FOR OCCUPANCY – to permit, provide or offer, for consideration, possession or occupancy of a building, dwelling unit, rooming unit, premise or structure by a person who is not the legal owner of record thereof, pursuant to a written or unwritten lease, agreement or license, or pursuant to a recorded or unrecorded agreement or contract for the sale of land.

l. MOTEL – a building or group of buildings which contain living and sleeping accommodations used primarily for transient occupancy, may be rented on a daily basis, and desk service is provided, and has individual entrances from outside the building to serve each such living or sleeping unit.

m. OCCUPANT – a person age 18 or older who resides at a Premises.

n. OPERATOR – any person who has charge, care or control of a Premises which is offered or let for occupancy.

o. OWNER – any Person, Agent, or Operator having a legal or equitable interest in the property; or recorded in the official records of the state, county, or municipality as holding title to the property; or otherwise having control of the property,

including the guardian of the estate of any such person, and the executor or administrator of the estate of such person if ordered to take possession of real property by a Court of competent jurisdiction.

p. OWNER – OCCUPANT- an owner who resides in a Dwelling Unit on a regular permanent basis, or who otherwise occupies a nonresidential portion of the Premises on a regular permanent basis.

q. PERSON – any person, partnership, firm, association, corporation, or municipal authority or any other group acting as a single unit.

r. POLICE DEPARTMENT – the Police Department of the City of Hazleton or any member thereof sworn to enforce laws and ordinances in the City, and includes the Chief of Police or his designee.

s. PREMISES – any parcel of real property in the City, including the land and all buildings and structures in which one or more Rental Units are located.

t. RENTAL UNIT – means a Dwelling Unit or Rooming Unit which is Let for Occupancy and is occupied by one or more Tenants.

171

u. ROOMING UNIT – any room or groups of rooms forming a single habitable unit occupied or intended to be occupied for sleeping or living, but not for cooking purposes.

v. TENANT – any Person authorized by the Owner or Agent who occupies a Rental Unit within a Premises regardless of whether such Person has executed a lease for said Premises.

SECTION 2. APPOINTMENT OF AN AGENT AND/OR MANAGER

Each Owner who is not an Owner-occupant, or who does not reside in the City of Hazleton or within a ten (10) mile air radius of the City limits, shall appoint an Agent who shall reside in the City or within a ten (10) mile air radius of the City limits.

SECTION 3. DUTIES OF THE OWNER AND/OR AGENT

a. The Owner has the duty to maintain the Premises in good repair, clean and sanitary condition, and to maintain the Premises in compliance with the current Codes, Building Codes and Zoning Ordinance of the City of Hazleton. The Owner may delegate implementation of these responsibilities to an Agent.

b. The duties of the Owner and/or Agent shall be to receive notices and correspondence, including service of process, from the City of Hazleton; to arrange for the inspection of the Rental

Units; do or arrange for the performance of maintenance, cleaning, repair, pest control, snow and ice removal, and ensure continued compliance of the Premises with the current Codes, Building Codes and Zoning Ordinance in effect in the City of Hazleton, as well as arrange for garbage removal.

c. The name, address and telephone number of the Owner and Agent, if applicable, shall be reported to the Code Enforcement Office in writing upon registering the Rental Units.

d. No Dwelling Unit shall be occupied, knowingly by the Owner or Agent, by a number of persons that is in excess of the requirements outlined in 2003 International Property Maintenance Code, Chapter 4, Light, Ventilation, and Occupancy Limits, Section PM-404.5, Overcrowding, or any update thereof, a copy of which is appended hereto and made a part hereof.

SECTION 4. NOTICES

a. Whenever an Inspector or Code Enforcement Officer determines that any Rental Unit or Premises fails to meet the requirements set forth in the applicable Codes, the Inspector or Code Enforcement Officer shall issue a correction notice setting forth the violations and ordering the Occupant, Owner or Agent,

as appropriate, to correct such violations.

The notice shall:

1) Be in writing;

2) Describe the location and nature of the violation;

3) Establish a reasonable time for the correction of the violation.

b. All notices shall be served upon the Occupant, Owner or Agent, as applicable, personally or by certified mail, return receipt requested. A copy of any notices served solely on an Occupant shall also be provided to the Owner or Agent. In the event service is first attempted by mail and the notice is returned by the postal authorities marked "unclaimed" or "refused", then the Code Enforcement Office or Police Department shall attempt delivery by personal service on the Occupant, Owner or Agent, as applicable. The Code Enforcement Office shall also post the notice at a conspicuous place on the Premises. If personal service directed to the Owner or Agent cannot be accomplished after a reasonable attempt to do so, then the notice may be sent to the Owner or Agent, as applicable, at the address stated on the most current registration application for the Premises in question, by regular first class mail, postage prepaid. If such notice is not returned by the postal authorities within five

(5) days of its deposit in the U.S. Mail, then it shall be deemed to have been delivered to and received by the addressee on the fifth day following its deposit in the United States Mail.

c. For purposes of this Ordinance, any notice hereunder that is given to the Agent shall be deemed as notice given to the Owner.

d. There shall be a rebuttable presumption that any notice that is given to the Occupant, Owner or Agent under this ordinance shall have been received by such Occupant, Owner or Agent if the notice was served in the manner provided by this ordinance.

e. Subject to paragraph 4.d above, a claimed lack of knowledge by the Owner or Agent, if applicable, of any violation hereunder cited shall be no defense to closure of rental units pursuant to Section 9, as long as all notices prerequisite to such proceedings have been given and deemed received in accordance with the provisions of this ordinance.

f. All notices shall contain a reasonable time to correct, or take steps to correct, violations of the above. The Occupant, Owner or Agent to whom the notice was addressed may request additional time to correct violations. Requests for additional time must be in writing and either deposited in the U.S. Mail

175

(post-marked) or handdelivered to the Code Enforcement Office within five (5) days of receipt of the notice by the Occupant, Owner or Agent. The City retains the right to deny or modify time extension requests. If the Occupant, Owner or Agent is attempting in good faith to correct violations but is unable to do so within the time specified in the notice, the Occupant, Owner or Agent shall have the right to request such additional time as may be needed to complete the correction work, which request shall not be unreasonably withheld.

g. Failure to correct violations within the time period stated in the notice of violation shall result in such actions or penalties as are set forth in Section 10 of this ordinance. If the notice of violation relates to actions or omissions of the Occupant, and the Occupant fails to make the necessary correction, the Owner or Agent may be required to remedy the condition. No adverse action shall be taken against an Owner or Agent for failure to remedy a condition so long as the Owner or Agent is acting with due diligence and taking bona fide steps to correct the violation, including but not limited to pursuing remedies under a lease agreement with an Occupant or Tenant. The City shall not be precluded from pursuing an enforcement action against any

176

Occupant or Tenant who is deemed to be in violation.

SECTION 5. INSURANCE

In order to protect the health, safety and welfare of the residents of the City, it is hereby declared that the city shall require hazard and general liability insurance for all property owners letting property for occupancy in the City.

a. Minimum coverage; use of insurance proceeds. All Owners shall be required to obtain a minimum of fifty thousand ($50,000.00) dollars in general liability insurance, and hazard and casualty insurance in an amount sufficient to either restore or remove the building in the event of a fire or other casualty. Further, in the event of any fire or loss covered by such insurance, it shall be the obligation of the Owner to use such insurance proceeds to cause the restoration or demolition or other repair of the property in adherence to the City Code and all applicable ordinances.

b. Property owners to provide City with insurance information. Owners shall be required to place their insurance company name, policy number and policy expiration date on their Rental Property Registration form, or in the alternative, to provide the Code Enforcement Office with a copy of a certificate of

insurance. A registration Certificate (see Section 6 below) shall not be issued to any Owner or Agent unless the aforementioned information has been provided to the Code Enforcement Office. The Code Enforcement Office shall be informed of any change in policies for a particular rental property or cancellation of a policy for said property within thirty (30) days of said change or cancellation.

SECTION 6. RENTAL REGISTRATION AND LICENSE REQUIREMENTS

a. No Person shall hereafter occupy, allow to be occupied, advertise for occupancy, solicit occupants for, or let to another person for occupancy any Rental Unit within the City for which an application for license has not been made and filed with the Code Enforcement Office and for which there is not an effective license. Initial application and renewal shall be made upon forms furnished by the Code Enforcement Office for such purpose and shall specifically require the following minimum information:

1) Name, mailing address, street address and phone number of the Owner, and if the Owner is not a natural person, the name, address and phone number of a designated representative of the

178

Owner.

2) Name, mailing address, street address and phone number of the Agent of the Owner, if applicable.

3) The street address of the Premises being registered.

4) The number and types of units within the Premises (Dwelling Units or Rooming Units) The Owner or Agent shall notify the Code Enforcement Office of any changes of the above information within thirty (30) days of such change.

b. The initial application for registration and licensing shall be made by personally filing an application with the Code Enforcement Office by November 1, 2006. Thereafter, any new applicant shall file an application before the Premises is let for occupancy, or within thirty (30) days of becoming an Owner of a currently registered Premises. One application per property is required, as each property will receive its own license.

c. Upon receipt of the initial application or any renewal thereof and the payment of applicable fees as set forth in Section 7 below, the Code Enforcement Office shall issue a Rental Registration License to the Owner within thirty (30) days of receipt of payment.

d. Each new license issued hereunder, and each renewal license,

shall expire on October 31 of each year. The Code Enforcement Office shall mail license renewal applications to the Owner or designated Agent on or before September 1 of each year. Renewal applications and fees may be returned by mail or in person to the Code Enforcement Office. A renewal license will not be issued unless the application and appropriate fee has been remitted.

SECTION 7. FEES.

a. Annual License Fee. There shall be a license fee for the initial license and an annual renewal fee thereafter. Fees shall be assessed against and payable by the Owner in the amount of $5.00 per Rental Unit, payable at the time of initial registration and annual renewal, as more specifically set forth in Section 6 above.

b. Occupancy Permit Fee. There shall be a one-time occupancy permit fee of $10.00 for every new Occupant, which is payable by the Occupant. For purposes of initial registration under this ordinance, this fee shall be paid for all current Occupants by November 1, 2006. Thereafter, prior to occupying any Rental Unit, all Occupants shall obtain an occupancy permit. It shall be the Occupant's responsibility to submit an occupancy permit

application to the Code Enforcement Office, pay the fee and obtain the occupancy permit. If there are multiple Occupants in a single Rental Unit, each Occupant shall obtain his or her own permit. Owner or Agent shall notify all prospective Occupants of this requirement and shall not permit occupancy of a Rental Unit unless the Occupant first obtains an occupancy permit. Each occupancy permit issued is valid only for the Occupant for as long as the Occupant continues to occupy the Rental Unit for which such permit was applied. Any relocation to a different Rental Unit requires a new occupancy permit. All Occupants age 65 and older, with adequate proof of age, shall be exempt from paying the permit fee, but shall be otherwise required to comply with this section and the rest of the Ordinance.

1. Application for occupancy permits shall be made upon forms furnished by the Code Enforcement Office for such purpose and shall specifically require the following minimum information:

a) Name of Occupant

b) Mailing address of Occupant

c) Street address of Rental Unit for which Occupant is applying, if different from mailing address

d) Name of Landlord

e) Date of lease commencement

f) Proof of age if claiming exemption from the permit fee

g) Proper identification showing proof of legal citizenship and/or residency

2. Upon receipt of the application and the payment of applicable fees as set forth above, the Code Enforcement Office shall issue an Occupancy Permit to the Occupant immediately.

SECTION 8. ENFORCEMENT

a. The following persons are hereby authorized to enforce this Ordinance:

1. The Chief of Police

2. Any Police Officer

3. Code Enforcement Officer

4. The Fire Chief

5. Deputy Fire Chief of the City of Hazleton.

6. Health Officer

7. Director of Public Works

b. The designation of any person to enforce this Ordinance or authorization of an Inspector, when in writing, and signed by a person authorized by Section 8.a to designate or authorize an Inspector to enforce this Ordinance, shall be prima facie

evidence of such authority before the Magisterial District Judge, Court of Common Pleas, or any other Court, administrative body of the City, or of this commonwealth, and the designating Director or Supervisor need not be called as a witness thereto.

SECTION 9. FAILURE TO CORRECT VIOLATIONS.

If any Person shall fail, refuse or neglect to comply with a notice of violation as set forth in Section 4 above, the City shall have the right to file an enforcement action with the Magisterial District Judge against any Person the City deems to be in violation. If, after hearing, the Magisterial District Judge determines that such Person or Persons are in violation, the Magisterial District Judge may, at the City's request, order the closure of the Rental Unit(s), or assess fines in accordance with Section 10 below, until such violations are corrected. Such order shall be stayed pending any appeal to the Court of Common Pleas of Luzerne County.

SECTION 10. FAILURE TO COMPLY WITH THIS ORDINANCE; PENALTIES

a. Except as provided in subsections 10.b and 10.c below, any Person who shall violate any provision of the Ordinance shall, upon conviction thereof after notice and a hearing before the

Magisterial District Judge, be sentenced to pay a fine of not less than $100.00 and not more than $300.00 plus costs, or imprisonment for a term not to exceed ninety (90) days in default of payment. Every day that a violation of this Ordinance continues shall constitute a separate offense, provided, however, that failure to register or renew or pay appropriate fees in a timely manner shall not constitute a continuing offense but shall be a single offense not subject to daily fines.

b. Any Owner or Agent who shall allow any Occupant to occupy a Rental Unit without first obtaining an occupancy permit is in violation of Section 7.b and shall, upon conviction thereof after notice and a hearing before the Magisterial District Judge, be sentenced to pay a fine of $1,000 for each Occupant that does not have an occupancy permit and $100 per Occupant per day for each day that Owner or Agent continues to allow each such Occupant to occupy the Rental Unit without an occupancy permit after Owner or Agent is given notice of such violation pursuant to Section 4 above. Owner or Agent shall not be held liable for the actions of Occupants who allow additional occupancy in any Rental Unit without the Owner or Agent's written permission, provided that Owner or Agent takes

reasonable steps to remove or register such unauthorized Occupant(s) within ten (10) days of learning of their unauthorized occupancy in the Rental Unit.

c. Any Occupant having an occupancy permit but who allows additional occupancy in a Rental Unit without first obtaining the written permission of the Owner or Agent and without requiring each such additional Occupant to obtain his or her own occupancy permit is in violation of Section 7.b of this ordinance and shall, upon conviction thereof after notice and a hearing before the Magisterial District Judge, be sentenced to pay a fine of $1,000 for each additional Occupant permitted by Occupant that does not have an occupancy permit and $100 per additional Occupant per day for each day that Occupant continues to allow each such additional Occupant to occupy the Rental Unit without an occupancy permit after Occupant is given written notice of such violation by Owner or Agent or pursuant to Section 4 above.

SECTION 11. APPLICABILITY AND EXEMPTIONS TO THE ORDINANCE

The provisions of the ordinance shall not apply to the following properties, which are exempt from registration and license

requirements:

a. Hotels, Motels and Dormitories.

b. Rental Units owned by Public Authorities as defined under the Pennsylvania Municipal Authorities Act, and Dwelling Units that are part of an elderly housing multi-unit building which is 75% occupied by individuals over the age of sixty-five.

c. Multi-dwelling units that operate under Internal Revenue Service Code Section 42 concerning entities that operate with an elderly component.

d. Properties which consist of a double home, half of which is let for occupancy and half of which is Owner-occupied as the Owner's residence.

SECTION 12. CONFIDENTIALITY OF INFORMATION

All registration information collected by the City under this Ordinance shall be maintained as confidential and shall not be disseminated or released to any individual, group or organization for any purpose except as provided herein or required by law. Information may be released only to authorized individuals when required during the course of an official City, state or federal investigation or inquiry.

SECTION 13. SAVINGS CLAUSE

This ordinance shall not affect violations of any other ordinance, code or regulation existing prior to the effective date thereof and any such violations shall be governed and shall continue to be punishable to the full extent of the law under the provisions of those ordinances, codes or regulations in effect at the time the violation was committed.

SECTION 14. SEVERABILITY

If any section, clause, provision or portion of this Ordinance shall be held invalid or unconstitutional by any Court of competent jurisdiction, such decision shall not affect any other section, clause, provision or portion of this Ordinance so long as it remains legally enforceable without the invalid portion. The City reserves the right to amend this Ordinance or any portion thereof from time to time as it shall deem advisable in the best interest of the promotion of the purposes and intent of this Ordinance, and the effective administration thereof.

SECTION 15. EFFECTIVE DATE

This Ordinance shall become effective immediately upon approval. This Ordinance repeals Ordinance number 2004-11 and replaces same in its entirety.

SECTION 16.

This Ordinance is enacted by the Council of the City of Hazleton under the authority of the Act of Legislature, April 13, 1972, Act No. 62, known as the "Home Rule Charter and Optional Plans Law", and all other laws enforceable the State of Pennsylvania.